# TOLEDO NEWSPAPER COMPANY ET AL. *v.* UNITED STATES.

## ERROR AND CERTIORARI TO THE CIRCUIT COURT OF APPEALS FOR THE SIXTH CIRCUIT.

No. 371. Argued March 7, 8, 1918.—Decided June 10, 1918.

A summary conviction for criminal contempt is not within the jurisdiction of this court by writ of error but reviewable by certiorari.

Judicial Code, § 268 (Act of March 2, 1831), is merely declaratory of the inherent power of the federal courts to punish summarily for contempt, and, in providing that the power "shall not be construed to extend to any cases except the misbehavior of any person in their presence, or so near thereto as to obstruct the administration' of justice," does no more than express a limitation imposed by the Constitution. The power, as in the case of the legislature (*Marshall v. Gordon*, 243 U. S. 521), is essentially one of self-preservation.

The test of the power is in the character of the acts in question: when their direct tendency is to prevent or obstruct the free and unprejudiced exercise of the judicial power, they are subject to be restrained through summary contempt proceedings.

Newspaper publications, concerning injunction proceedings pending in the District Court, and tending in the circumstances to create the impression that a particular decision would evoke public suspicion of the judge's integrity or fairness and bring him into public odium and would be met by public resistance, and tending in the circumstances to provoke such resistance in fact, *held*, contemptuous, rendering the company owning the paper and its editor subject to summary conviction and punishment.

Such wrongful publications are not within the "freedom of the press;" nor does the Act of 1831, *supra*, Jud. Code, § 268, intend to sanction them.

As it is the reasonable tendency of such publications that determines their contemptuous character, it is not material that they were not circulated in the court room or seen by the judge or that they did not influence his mind.

In determining whether there was any evidence to justify attributing such a tendency to the publications in question, this court considers the evidentiary facts found by the District Court only so far as to

determine whether they have any reasonable tendency to sustain the general conclusions of fact based upon them by that court and the Circuit Court of Appeals.

In a summary proceeding for criminal contempt, *semble,* that a single penalty based upon a conviction under all of several distinct charges in the information cannot be upheld unless all of the charges are sustained by the facts.

But where the Circuit Court of Appeals, upon concluding that the conviction was justified under one count and the facts relative thereto, affirmed the District Court without considering other counts upon which the punishment was also based, this court examined the findings as to all the counts, and, holding them sufficient, affirmed the judgment.

237 Fed. Rep. 986, affirmed.

THE case is stated in the opinion.

*Mr. Lawrence Maxwell,* with whom *Mr. Charles S. Northup, Mr. Jay W. Curts* and *Mr. Joseph S. Graydon* were on the brief, for petitioners:

The power of the District Courts to punish summarily for contempt has been limited by Congress (Const., Art. III, § 1, Art. I, § 8), by the Act of March 2, 1831, Rev. Stats., § 725, Jud. Code, § 268, so that it cannot apply to newspaper comments and criticisms concerning pending cases which do not amount to misbehavior of any person in the presence of such courts or so near thereto as to obstruct the administration of justice. In this case it was neither alleged, proved nor found that any of the publications complained of was brought into the court room or court building or read by the District Judge.

Prior to the impeachment of Judge Peck, whose acquittal was followed by this act, the question of the power of the courts in this regard does not appear to have been agitated except in the State of Pennsylvania. Two reported cases (*Respublica* v. *Oswald,* 1 Dall. 318, in the Supreme Court of Pennsylvania [1788], and *Hollingsworth* v. *Duane,* Fed Cas., No. 6616, in the United States Circuit Court for Pennsylvania [1801], promulgated the doctrine that courts in the United States had a common-

law power to punish in such cases, and held that the constitutional guarantee of trial by jury had no application. The judges erroneously supposed that, by the common law, courts of record in England possessed this power, whereas in truth it had never been so held except as to the courts constituting the *aula regis*, and in respect to them on the theory that the sovereign personally dispensed justice. *Reg.* v. *Lefroy*, L. R., 8 Q. B. 134; Oswald on Contempt, 3d ed., p. 3; 3 Holdsworth, History English Law, p. 312. The *Oswald Case* and *Respublica* v. *Passmore*, 3 Yeates, 441 (1804) gave rise eventually to an act of the Pennsylvania legislature, passed in 1809, which limited the power to cases of official misconduct of court officers, disobedience by officers, parties, jurors or witnesses of lawful process, and "misbehavior of any person in the presence of the court, thereby obstructing the administration of justice," besides providing specifically that publications out of court should not be made the basis of summary attachment and punishment. The history of this controversy is found in the note to the *Oswald Case*, in the report of the *Passmore Case, supra*, and in "Constructive Contempt" by Judge John L. Thomas.

The immediate occasion of the Act of 1831 was the impeachment and acquittal in Congress of Judge Peck, who had assumed to punish summarily for a publication referring to a case that had terminated. But it does not follow that Congress intended to confine the limitations of the statute to such cases. It is rather to be presumed that Congress had in mind the controversy in Pennsylvania, the more so because Mr. Buchanan who was one of the prosecutors of Peck, and who also reported the bill for this act, was from that State and undoubtedly was familiar with the occasion of the Pennsylvania statute and held strong views on the subject. Gales and Seatons Register of the Debates, 1831, p. 42.

That this meaning of the statute, which seems upon its

face to present no ambiguity, was clearly understood at the time of its enactment is shown by the first decision under it. *Ex parte Poulson*, Fed. Cas., No. 11350. See also the following: *United States v. Holmes*, Fed. Cas., No. 15853; *Ex parte Bradley*, 7 Wall. 364; Curtis, Jurisdiction of the United States Courts, 2d ed., p. 176; *Ex parte Robinson*, 19 Wall. 505, 510; *McCaully's Case*, 25 App. D. C. 404; *In re May*, 1 Fed. Rep. 737; *United States v. Anonymous*, 21 Fed. Rep. 761, 768; *Ex parte Schulenburg*, 25 Fed. Rep. 211; *Savin, Petitioner*, 131 U. S. 267; *Cuddy, Petitioner*, 131 U. S. 280; *Morse v. Montana Ore Purchasing Co.*, 105 Fed. Rep. 337; *Boyd v. Glucklich*, 116 Fed. Rep. 131; *Ex parte McLeod*, 120 Fed. Rep. 130; *Cuyler v. Atlantic & N. C. R. Co.*, 131 Fed. Rep. 95; *Myers v. State*, 46 Ohio St. 473 (first official syllabus, and opinion p. 474).

In *United States v. Huff*, 206 Fed. Rep. 700, the letters were sent to the judge while the case was pending. In *In re Independent Publishing Co.*, 228 Fed. Rep. 787; 240 Fed. Rep. 849, the publication was read by the jurors. *United States v. Providence Tribune Co.*, 241 Fed. Rep. 524, involved an article concerning grand jury proceedings.

*Patterson v. Colorado*, 205 U. S. 454, merely decided that the case did not involve a federal question. The Act of 1831 was not involved or mentioned. And see the dissenting opinions. *Eilenbecker v. District Court of Plymouth County*, 134 U. S. 31, was also a writ of error to a state court, involving a proceeding in contempt for wilful disobedience of an injunction. This court held that the Fourteenth Amendment did not guarantee a trial by jury in such a case.

Where the question is, whether a newspaper article published outside the court constitutes misbehavior so near thereto as to obstruct the administration of justice, the necessary nearness cannot be imputed in the absence

of such knowledge of the publication by the court or jury as did or might have obstructed the administration of justice, as in the *Huff* and *Myers Cases, supra.* It may be conceded that in such cases the "physical or topographical nearness" of the place where the article is written or printed becomes immaterial, and it may be that an act which is in intention and effect contumacious, committed in the presence of the court, is punishable without regard to whether it actually obstructs justice. But you cannot bring a publication outside of court within the terms of the statute on the theory that its communication to the court or jury does away with any other physical or topographical nearness required by the statute, and at the same time dispense with the essential requirement that it should actually be brought to the attention of the court or jury in such manner as to interfere with or obstruct their deliberations.

The contempt proceeding was not instituted, nor were the sentences imposed, for any purpose authorized by § 1 of the Act of 1831, but for the punishment of past offenses punishable only by indictment under § 2. *Marshall* v. *Gordon,* 243 U. S. 521, 540, 542.

On the strict view of this power in England and its common-law limitations: *McLeod* v. *St. Aubyn,* [1899] A. C. 549; 2 Bac. Abr., 7th ed., p. 399; 3 Encyc. of Laws of England, p. 500, "Contempt of Court;" *In re Clements,* [1876] 46 L. J. Ch. 375, 385; *Hunt* v. *Clarke,* [1899], 37 W. R. 724, 725.

The alleged incitement to disregard the court's order stands on the same ground as if it were made orally in a speech away from the presence of the court. Such incitement is not the misbehavior in court or near thereto that the statute deals with. The word "misbehavior" generally, and especially as used in the Act of 1831, connotes action or deportment in respect to the presence of another, and implies such presence. The actual resistance or ob-

struction to the execution of any writ or order of the court, committed out of the presence of the court, is punishable by indictment under § 2 of the Act of 1831. *Hillmon* v. *Mutual Life Insurance Co.,* 79 Fed. Rep. 749; *United States* v. *Carroll,* 147 Fed. Rep. 947.

The Court of Appeals erred in holding that it was immaterial whether the record showed error as to the second and third counts. *Gompers* v. *Bucks Stove & Range Co.,* 221 U. S. 440; *Claassen* v. *United States,* 142 U. S. 140, distinguished.

*Mr. William L. Day* and *Mr. Assistant Attorney General Fitts* for the United States:

Error will not lie to review a judgment of the Circuit Court of Appeals in a contempt proceeding.

Parties have a constitutional right to have their causes tried fairly by an impartial court uninfluenced by newspaper dictation or popular clamor. The courts below applied the law of contempt as it is administered in substantially all the state jurisdictions, as it always was and is now at common law, (*Patterson* v. *Colorado,* 205 U. S. 454, 462; Bishop's New Criminal Law, §§ 259, 260, 261; Bailey, Habeas Corpus, c. 7; Oswald, Contempt, pp. 91, 92, 97; Rapalje on Contempt, § 56; 9 Cyc. 20), and as it is now in England, and as it was in the federal jurisdiction prior to 1831 (*Hollingsworth* v. *Duane,* Fed. Cas., No. 6616; *United States* v. *Hudson,* 7 Cranch, 32). See Lord Chancellor Hardwicke in 2 Atkyns, 471. Likewise, 2 Vesey, 520; 1 P. Wms. 675; 4 Blackstone Com. 282; 2 Hawkins, Pleas of the Crown, 230; 29 Am. Law Reg. 82.

The language employed need not have brought the court into disfavor or endangered proper respect, or actually embarrassed or impeded the progress of the proceedings or the administration of justice therein, if it was of a character calculated to produce such effects, in a case pending.

The Act of 1831 was adopted by Virginia and by Ohio
soon after its passage, and in both States received the
same construction as was given it by the courts below.
*Carter* v. *Commonwealth*, 96 Virginia, 791; *Myers* v. *State*,
46 Ohio St. 473; *Steube* v. *State*, 3 Ohio Cr. Ct. 383; 2
O. C. D. 216.

The statute, as its title indicates, is declaratory of the
common law. It did not change the procedure, nor did it
change the class of things punishable as contempts at
common law. *Cuyler* v. *Atlantic & N. C. R. Co.*, 131 Fed.
Rep. 95, 97.

A statute should not be held to limit powers inherently
possessed by courts and necessary to their protection,
unless such an intention is clearly and explicitly stated.

The tendency of the publication or act to interfere
with the administration of the law is enough. *Patterson*
v. *Colorado*, 205 U. S. 454, 463; *In re Independent Pub-
lishing Co.*, 240 Fed. Rep. 849; *United States* v. *Providence
Tribune Co.*, 241 Fed. Rep. 524; *Gorham Mfg. Co.* v.
*Emery-Bird-Thayer Dry Goods Co.*, 92 Fed. Rep. 774.
It has never been held, except for the language of Justice
Baldwin in *In re Poulson*, Fed. Cas., No. 11350, that the
statute was intended as a limitation upon the inherent
power of a federal court to punish as contemptuous the
publication of offensive news articles during the pend-
ency of the litigation. *Cuyler* v. *Atlantic & N. C. R. Co.*,
*supra*, merely follows that case, and what was said on this
subject in *In re May*, 1 Fed. Rep. 737, 742, and *Morse* v.
*Montana Ore Purchasing Co.*, 105 Fed. Rep. 337, is *dictum*.

The statute is too plain to permit resort to its legisla-
tive history. But, if this were otherwise, a careful exam-
ination, as shown by the opinion of the District Court
in the present case, serves rather to prove a purpose not
to exempt any class of persons than a purpose to estab-
lish the immunity claimed. See *Carter* v. *Commonwealth*,
*supra*. The act followed proceedings taken in Congress

against Judge Peck because he had inflicted punishment for a publication made after the case to which it referred had terminated.  The views expressed in the *Poulson Case* are based on a misunderstanding of the controversy thus engendered, and are wholly unsound—as to which see: 1 Kent Com., 301, note; *State* v. *Galloway*, 5 Cold. (Tenn.) 326, 330; *Myers* v. *State, supra.*

Comparison of this act with the earlier one of Pennsylvania demonstrates that Congress, while in part it adopted the substance and phraseology of the state law, took pains to eliminate the express provision granting immunity to publications out of court and added the new provision for punishing misbehavior beyond the presence of the court, yet "so near thereto as to obstruct the administration of justice," thus evincing a clear intent not to give immunity to newspapers.

The tendency of the act complained of to affect a pending cause is the test under this statute.  Aside from the *Poulson Case,* and dicta in the *Morse* and *May Cases, supra, Ex parte Schulenburg,* 25 Fed. Rep. 211, and *Ex parte Robinson,* 19 Wall. 505, this proposition is sustained in principle by all the decisions.  *Savin, Petitioner,* 131 U. S. 267; *Sharon* v. *Hill,* 24 Fed. Rep. 726; *Cuddy, Petitioner,* 131 U. S. 280; *McCaully's Case,* 25 App. D. C. 404; 198 U. S. 582, 586; *United States* v. *Anonymous,* 21 Fed. Rep. 761; *In re Brule,* 71 Fed. Rep. 943; *Ex parte McLeod,* 120 Fed. Rep. 130; *United States* v. *Carroll,* 147 Fed. Rep. 947; *United States* v. *Zavelo,* 177 Fed. Rep. 536; *Kirk* v. *United States,* 192 Fed. Rep. 273; *In re Steiner,* 195 Fed. Rep. 299, 303; *United States* v. *Huff,* 206 Fed. Rep. 700; *O'Neal* v. *United States,* 190 U. S. 36.

The question as to press comments is answered by the state courts in *Myers* v. *State, supra; Tate* v. *State,* 132 Tennessee, 131; *People* v. *Wilson,* 64 Illinois, 195, 211; *Telegram Newspaper Co.* v. *Commonwealth,* 172 Massachusetts, 294; and *State* v. *Howell,* 80 Connecticut, 668.

The essence of the offense is conduct reasonably calculated to produce an atmosphere of prejudice where the pending case is being tried. *State* v. *Hazeltine*, 82 Washington, 81. The liberty of the press does not permit publications respecting pending causes which are reasonably calculated to interfere with the due administration of justice. *State* v. *Morrill*, 16 Arkansas, 384; *People* v. *News-Times Publishing Co.*, 35 Colorado, 253; 205 U. S. 454; *McDougall* v. *Sheridan*, 23 Idaho, 191; *State* v. *Shepherd*, 177 Missouri, 205; *State* v. *Rosewater*, 60 Nebraska, 438; *Burdett* v. *Commonwealth*, 103 Virginia, 838; *State* v. *Hazeltine, supra*.

*United States* v. *Huff*, and *United States* v. *Anonymous*, *supra*, discuss the relation to this question of the federal act. There is no reason why federal courts should not apply this statute as state courts apply local statutes of similar import.

Mr. Chief Justice White delivered the opinion of the court.

This case is before us on error to review the action of the court below affirming a judgment of the trial court holding the defendants guilty of a summary contempt and imposing a fine upon them both. There is also pending an application for certiorari made upon the assumption that if jurisdiction on error was wanting the case involved questions of such importance as to justify our interposition.

We are of opinion that a motion to dismiss the writ of error must prevail since it is settled that a conviction for a criminal, although summary, contempt is for the purposes of our reviewing power a matter of criminal law not within our jurisdiction on error. *Cary Manufacturing Co.* v. *Acme Flexible Clasp Co.*, 187 U. S. 427, 428; *O'Neal* v. *United States*, 190 U. S. 36, 38; *Bessette* v. *W. B. Conkey*

*Co.,* 194 U. S. 324, 335; *In re Merchants' Stock & Grain Co.,* 223 U. S. 639; *Gompers* v. *United States,* 233 U. S. 604, 606. But this does not relieve us from the duty of exerting jurisdiction, as we are of opinion that the case calls for the exertion of the discretionary power with which we are vested. The writ of certiorari is therefore granted, and we proceed to examine and dispose of the case to the extent rendered necessary by that conclusion.

The case is this. The Toledo Railways and Light Company in 1913 controlled and operated practically all the street railways in Toledo. The franchises under which it did so, however, it was generally considered, expired on the 27th of March, 1914. In anticipation of this fact, negotiations as to the terms upon which they should be renewed were broached between the city and the company, and pronounced differences were manifested. This gave rise to public agitation and discussion over the question which had become acute in November, 1913. In that month, evidently in order to enable the city to secure from the company such terms of agreement as it might impose, an ordinance was passed, without giving any new franchise or in terms making any new contract with the company, providing that after the 27th of March, 1914, the assumed day of the expiration of the franchises, three-cent fares should be charged from day to day. Complaint, alleging the injustice of this provision and the wrong which the railroad asserted would be produced by giving it effect, increased the agitation.

In January, 1914, creditors of the company filed in the District Court of the United States their bill against the company to enjoin it from obeying the ordinance on the ground that to do so would confiscate the property which they held in the company and would destroy the franchises which the company enjoyed and which, it was asserted, only expired in the following October. On March 24th

the creditors filed a supplemental bill making the city a party to the suit and asking preliminary and permanent injunctions against the city. On the same day, the company also filed its bill against the city seeking to restrain the enforcement of the ordinance both by preliminary and final injunctions.

At this juncture and before action had been taken by the court, The Toledo News-Bee, a daily paper, published in Toledo by The Toledo Newspaper Company, began publications adverse to the rights asserted against the city by the creditors and the railway company and in no uncertain terms avouched the right of the city to have enacted the ordinance which the suits assailed and challenged the right of the court to grant the relief prayed. On March 30th the court, after hearing on the applications for preliminary injunctions, denied them on the ground that the assailed ordinance was not self-enforcing, that it required an application of judicial power to put it into effect and that it would be time enough when the city invoked such relief by such power to assert by way of defense the matters which were made the basis of the prayer for affirmative relief in the pending controversies.

In September following, under a new prayer, the court reconsidered its action and awarded the preliminary injunction prayed on the ground that as the city had in the meanwhile treated the ordinance as enforcible without resort to judicial process and was acting against the company and the creditors and their alleged rights on that assumption, the duty was cast upon the court of protecting such rights pending the decision of the causes. In the meanwhile, however, the agitation over the questions which the suits involved had unremittingly continued and was beyond doubt fanned by continuous publications on the subject in the stated newspaper into a more exaggerated—not to use a stronger word—and·

vociferous expression which embraced the whole field; that is, not only the relative rights of the city and the corporation, but also, at least by indirection, the duty and power of the court and its right to afford any relief in the matters before it.

Immediately preceding the action of the court taken on September 12th granting the preliminary injunction, and while that subject was before it for consideration, an attachment for contempt was issued against one Quinlivan for words spoken by him at a meeting of a labor union concerning the court and the matter which it was then engaged in considering. And a few days following, on September 15th, a similar process was issued against the managing editor of the Toledo News-Bee for publications written by him in the paper concerning the action of the court in the Quinlivan case.

On September 29th following, the court directed the district attorney to present an information for contempt against the newspaper company and its editor for the publications which had been made concerning the controversy, and on October 28th, giving effect to this order, an information was filed charging the newspaper company and the editor with contempt. The charges were stated in three counts. The first embraced matters published during the pendency of the suit from the time, March 24th, when the action was taken to make the city a party and the respective preliminary injunctions were prayed, up to and including the time when the ultimate action of the court on the subject in September was taken. The two other counts related, the one to publications made at the time of and concerning the attachment for contempt against Quinlivan, and the other to publications concerning the attachment against the managing editor. The defendants demurred on the ground that the information stated no act within the power of the court to

punish for contempt, and, on the overruling of the demurrer, they answered, not disputing the publications charged, but challenging the innuendoes by which in the information they were interpreted and reiterating the denial of all power in the court to punish.

Coming to dispose of the information, the court found both of the defendants guilty under all the counts and imposed upon both a punishment by way of fine. The court sustained its authority to so act by an elaborate opinion which, after stating the evidentiary facts—the publications and their environment—, drew from them ultimate conclusions of fact and held that from such conclusions it clearly resulted that the publications complained of constituted a contempt within the power of the court to punish, because, by their terms, they manifestly tended to interfere with and obstruct the court in the discharge of its duty in a matter pending before it. Condensing for the sake of brevity and looking at the substance of things, these conclusions of the court embraced four grounds: (a) Because, leaving aside the attempted ridicule, not to say vituperation, concerning the court which was expressly or impliedly contained in the publications, their manifest purpose was to create the impression on the mind of the court that it could not decide in the matter before it in any but the one way without giving rise to such a state of suspicion as to the integrity or fairness of its purpose and motives as might engender a shrinking from so doing.   (b) Because the publications directly tended to incite to such a condition of the public mind as would leave no room for doubt that if the court, acting according to its convictions, awarded relief, it would be subject to such odium and hatred as to restrain it from doing so.   (c) Because the publications also obviously were intended to produce the impression that any order which might be rendered by the court in the discharge of its duty, if not in accord with the con-

ceptions which the publications were sustaining, would be disregarded and cause a shrinking from performing duty to avoid the turmoil and violence which the publications, it may be only by covert insinuation, but none the less assuredly, invited. And (d) because the publications were of a character, not merely because of their intemperance but because of their general tendency, to produce in the popular mind a condition which would give rise to a purpose in practice to refuse to respect any order which the court might render if it conflicted with the supposed rights of the city espoused by the publications. 220 Fed. Rep. 458.

The affirmance by the court below of the action of the trial court thus stated, is the matter now before us for review. That court, not asserting the right or attempting to exert the power to review the merely evidentiary facts found by the trial court, but accepting them, in express terms sanctioned the inferences of ultimate fact drawn from them by the trial court. The court said: "The publications had reference to pending judicial action, and there is a finding of fact ('as alleged in the information') that they tended and were intended to provoke public resistance to an injunctional order, if one should be made, and there is a finding that they constituted an attempt to intimidate,—at least unduly to influence,—the district judge with reference to his decision in the matter pending before him. That each of these findings is supported by competent evidence and for that reason binding upon this court is too clear for dispute; but we may rightly go further and say that it is difficult to see how any other findings could have been made." This view, however, was restricted to the matters embraced by the first count, since it was decided that it was irrelevant to consider whether the same view would obtain as to the subject-matters of the second and third counts because it was held that in any event the finding of guilt under the first

count was adequate to justify the penalty imposed, thus rendering a consideration of the other two counts unnecessary. 237 Fed. Rep. 986.

Under the case and the action of the courts below concerning it, nothing further would seem to be required to establish the correctness of that action, since no other course, under the statement, is possible compatibly with the sacred obligation of courts to preserve their right to discharge their duties free from unlawful and unworthy influences and, in doing so, if need be, to clear from the pathway leading to the performance of this great duty all unwarranted attempts to pervert, obstruct or distort judgment. Nevertheless, in view of the gravity of the subject, we proceed to consider and dispose of the elaborate arguments pressed to the contrary. They are all embraced by the three following propositions: first, that there was a total want of power in the court to treat the matters charged in the information as a contempt and punish it accordingly, as a result of the provisions of § 268 of the Judicial Code (embodying the text of the Act of March 2, 1831, 4 Stat. 487); second, that, irrespective of the prohibitions of that act, there was a want of power to abridge the freedom of the press by punishing as for a summary contempt comments made by a newspaper upon matters of public concern; and third, that, whatever be the view of the two former propositions, as there was an entire absence of proof sustaining the ultimate inferences of fact upon which the court based its conclusion, such conclusion was wholly erroneous as a matter of law. We dispose of these propositions under separate headings.

1. *Section 268 of the Judicial Code and its forerunner, the Act of 1831.*

It is essential to recall the situation existing at the time of the adoption of the Act of 1831 in order to elucidate its provisions. In *Marshall v. Gordon,* 243 U. S. 521, the power of Congress to summarily punish for contempt

came under consideration and it was there pointed out that the enlarged legislative power on that subject which prevailed in England prior to the separation, whether based upon the commingling of legislative and judicial authority or upon any other cause, was necessarily in this country greatly restricted and changed by the effect of the adoption of the Constitution and the operation of the division of powers and the guarantees and limitations which that instrument embodied. Considering this condition in the light of the colonial legislation on the subject and the previous state constitutions, it was pointed out that it had come to be established, either by express constitutional or legislative provisions or by inevitable implications resting upon the very existence of government, that, while the limitations as to mode of accusation of crime and methods of trial had fundamentally changed the situation which had previously existed, such change had not deprived the legislative power of the right, irrespective of its authority by legislation to provide for the trial and punishment of criminal acts, in addition to summarily deal by way of contempt proceedings with wrongful acts obstructing the legislative power in the performance of its duty. This authority, it was held, was but an incident of the powers conferred, and, indeed, that its exertion in ultimate analysis was a means of securing the effective operation of the constitutional limitations as to mode of accusation and methods of trial. It was pointed out that the authority thus recognized automatically inhered in the government created by the Constitution, was sanctioned by a long line of judicial decisions and by state and federal practice, although the legislative power, doubtless as a mere consequence of a reminiscence of what had gone before, and momentarily forgetful of the limitations resulting from the Constitution, had sometimes exerted authority in excess of that which it was decided was really possessed.

While the *Marshall Case* concerned the exercise of
legislative power to deal with contempt, the fundamental
principles which its solution involved are here applicable,
to the extent that they may not be inapposite because
of the distinction between legislative and judicial power.
Indeed the identity of the constitutional principles
applicable to the two cases, subject to the differences
referred to was pointed out on pages 542 and 543, where
it was said: "So also when the difference between the
judicial and legislative powers are considered and the
divergent elements which in the nature of things enter
into the determination of what is self-preservation in
the two cases, the same result is established by the statu-
tory provisions dealing with the judicial authority to
summarily punish for contempt, that is, without re-
sorting to the modes of trial required by constitu-
tional limitations or otherwise for substantive offenses
under the criminal law. Act of March 2, 1831, 4 Stat.
487."

The pertinent provision of § 268 of the Judicial Code
is as follows: "The said courts [United States courts]
shall have power . . . to punish, by fine or im-
prisonment, at the discretion of the court, contempts of
their authority: *Provided,* That such power to punish
for contempts shall not be construed to extend to any
cases except the misbehavior of any person in their pres-
ence, or so near thereto as to obstruct the administration
of justice . . ."

Clarified by the matters expounded and the ruling
made in the *Marshall Case,* there can be no doubt that
the provision conferred no power not already granted
and imposed no limitations not already existing. In other
words, it served but to plainly mark the boundaries of
the existing authority resulting from and controlled by
the grants which the Constitution made and the limita-
tions which it imposed. And this is not at all modified

by conceding that the provision was intended to prevent the danger, by reminiscence of what had gone before, of attempts to exercise a power not possessed which, as pointed out in the *Marshall Case*, had been sometimes done in the exercise of legislative power. The provision therefore, conformably to the whole history of the country, not minimizing the constitutional limitations nor restricting or qualifying the powers granted, by necessary implication recognized and sanctioned the existence of the right of self-preservation, that is, the power to restrain acts tending to obstruct and prevent the untrammeled and unprejudiced exercise of the judicial power given by summarily treating such acts as a contempt and punishing accordingly. The test, therefore, is the character of the act done and its direct tendency to prevent and obstruct the discharge of judicial duty,—a conclusion which necessarily sustains the view of the statute taken by the courts below and brings us to the second question, which is:

2. *The asserted inapplicability of the statute under the assumption that the publications complained of related to a matter of public concern and were safeguarded from being made the basis of contempt proceedings by the assuredly secured freedom of the press.*

We might well pass the proposition by because to state it is to answer it, since it involves in its very statement the contention that the freedom of the press is the freedom to do wrong with impunity and implies the right to frustrate and defeat the discharge of those governmental duties upon the performance of which the freedom of all, including that of the press, depends. The safeguarding and fructification of free and constitutional institutions is the very basis and mainstay upon which the freedom of the press rests, and that freedom, therefore, does not and cannot be held to include the right virtually to destroy such institutions. It suffices to say that, however com-

plete is the right of the press to state public things and discuss them, that right, as every other right enjoyed in human society, is subject to the restraints which separate right from wrong-doing.

The contention so earnestly pressed, that the express provision, found in a statute enacted in Pennsylvania in 1809, following impeachment proceedings against certain judges of that State and dealing with the extent of the power to base a contempt proceeding upon a newspaper publication, should be by implication read into the Act of 1831 and by filtration implied in §268, Judicial Code, we think is answered by its mere statement, since, if it be conceded for argument's sake only that the provision in the Pennsylvania statute relied upon had the significance now attributed to it and that the Pennsylvania statute was the model of the Act of 1831, the omission from that act of the provision referred to as it existed in the Pennsylvania law is the strongest possible evidence of the purpose not to enact such provision. And thus we come to the third and final subject, which is:

3. *The contention that there was no evidence whatever to justify attributing to the publications the consequence of obstruction and therefore no legal basis for the conclusion of guilt and resulting right to impose penalties.*

It is to be observed that our power in disposing of this objection is not to test divergent contentions as to the weight of the evidence but simply to consider the legal question whether the evidentiary facts found had any reasonable tendency to sustain the general conclusions of fact based upon them by the courts below. Considering the subject in this aspect, again we are constrained to say that the contention on the face of the record is too plainly devoid of merit to require any detailed review. Indeed, we are of opinion that the court below was right in saying concerning the ultimate conclusions of fact upon which its action was based that it was "difficult

to see how any other findings could have been made."
True, it is urged that, although the matters which were
made the basis of the findings were published at the place
where the proceedings were pending and under the cir-
cumstances which we have stated in a daily paper having
large circulation, as it was not shown that they had been
seen by the presiding judge or had been circulated in the
court room, they did and could form no basis for an in-
ference of guilt.   But the situation is controlled by the
reasonable tendencies of the acts done and not by extreme
and substantially impossible assumptions on the subject.
Again, it is said there is no proof that the mind of the
judge was influenced or his purpose to do his duty ob-
structed or restrained by the publications and, therefore,
there was no proof tending to show the wrong complained
of.   But here again not the influence upon the mind of
the particular judge is the criterion but the reasonable
tendency of the acts done to influence or bring about the
baleful result is the test.   In other words, having regard
to the powers conferred, to the protection of society, to
the honest and fair administration of justice and to the
evil to come from its obstruction, the wrong depends upon
the tendency of the acts to accomplish this result with-
out reference to the consideration of how far they may
have been without influence in a particular case.   The
wrongdoer may not be heard to try the power of the
judge to resist acts of obstruction and wrongdoing by
him committed as a prelude to trial and punishment
for his wrongful acts.

   This disposes of the case, for although the court below,
we think mistakenly, considered that it was not under
the duty to determine how far the facts sustained the
charges under counts 2 and 3 because the conviction
might be referred wholly to the first count (*Gompers* v.
*Bucks Stove & Range Co.*, 221 U. S. 418, 440), we
are of opinion, after examining the facts as to both of

those counts, that they also sustain the conviction within the principles which we have just previously stated.

*Affirmed.*

MR. JUSTICE DAY and MR. JUSTICE CLARKE took no part in the decision of this cause.

MR. JUSTICE HOLMES, dissenting.

One of the usual controversies between a street railroad and the city that it served had been going on for years and had culminated in an ordinance establishing three cent fares that was to go into effect on March 28th, 1914. In January of that year the people who were operating the road began a suit for an injunction on the ground that the ordinance was confiscatory. The plaintiffs in error, a newspaper and its editor, had long been on the popular side and had furnished news and comment to sustain it; and when, on March 24, a motion was made for a temporary injunction in the suit, they published a cartoon representing the road as a moribund man in bed with its friends at the bedside and one of them saying "Guess we'd better call in Doc Killits." Thereafter pending the controversy they published news, comment and cartoons as before. The injunction was issued on September 12. The Judge (Killits) who was referred to took no steps until September 29, when he directed an information to be filed covering publications from March 24 through September 17. This was done on October 28. In December the case was tried summarily without a jury by the judge who thought his authority contemned, and in the following year he imposed a considerable fine. The question is whether he acted within his powers under the statutes of the United States.

The statute in force at the time of the alleged contempts confined the power of Courts in cases of this sort to where

there had been "misbehavior of any person in their presence, or so near thereto as to obstruct the administration of justice." § 268, Jud. Code, Act of March 3, 1911, c. 231, 36 Stat. 1163. Before the trial took place an act was passed giving a trial by jury upon demand of the accused in all but the above mentioned instances. October 15, 1914, c. 323, §§ 22, 24, 38 Stat. 738, 739. In England, I believe, the usual course is to proceed in the regular way by indictment. I mention this fact and the later statute only for their bearing upon the meaning of the exception in our law. When it is considered how contrary it is to our practice and ways of thinking for the same person to be accuser and sole judge in a matter which, if he be sensitive, may involve strong personal feeling, I should expect the power to be limited by the necessities of the case "to insure order and decorum in their presence" as is stated in *Ex parte Robinson*, 19 Wall. 505. See Prynne, Plea for the Lords, 309, cited in McIlwain, The High Court of Parliament and its Supremacy, 191. And when the words of the statute are read it seems to me that the limit is too plain to be construed away. To my mind they point and point only to the present protection of the Court from actual interference, and not to postponed retribution for lack of respect for its dignity—not to moving to vindicate its independence after enduring the newspaper's attacks for nearly six months as the Court did in this case. Without invoking the rule of strict construction I think that "so near as to obstruct" means so near as actually to obstruct—and not merely near enough to threaten a possible obstruction. "So near as to" refers to an accomplished fact, and the word "misbehavior" strengthens the construction I adopt. Misbehavior means something more than adverse comment or disrespect.

But suppose that an imminent possibility of obstruction is sufficient. Still I think that only immediate and necessary action is contemplated, and that no case for sum-

mary proceedings is made out if after the event publica-
tions are called to the attention of the judge that might
have led to an obstruction although they did not.  So far
as appears that is the present case.  But I will go a step
farther.  The order for the information recites that from
time to time sundry numbers of the paper have come to
the attention of the judge as a daily reader of it, and I
will assume, from that and the opinion, that he read them
as they came out, and I will assume further that he was
entitled to rely upon his private knowledge without a
statement in open court.  But a judge of the United
States is expected to be a man of ordinary firmness of char-
acter, and I find it impossible to believe that such a judge
could have found in anything that was printed even a
tendency to prevent his performing his sworn duty.
I am not considering whether there was a technical
contempt at common law but whether what was done
falls within the words of an act intended and admitted
to limit the power of the Courts.

The chief thing done was to print statements of a
widespread public intent to board the cars and refuse to
pay more than three cents even if the judge condemned
the ordinance, statements favoring the course, if you
like, and mention of the city officials who intended to
back it up.  This popular movement was met on the part
of the railroad by directing its conductors not to accept
three cent fares but to carry passengers free who refused
to pay more; so that all danger of violence on that score
was avoided, even if it was a danger that in any way con-
cerned the Court.  The newspaper further gave one or
two premature but ultimately correct intimations of what
the judge was going to do, made one mistaken statement
of a ruling which it criticised indirectly, uttered a few
expressions that implied that the judge did not have the
last word and that no doubt contained innuendoes not
flattering to his personality.  Later there was an account

of a local socialist meeting at which a member, one Quinlivan, spoke in such a way that the judge attached him for contempt and thereupon, on the same day that the decree was entered in the principal case, the paper reported as the grounds of the attachment that Quinlivan had pronounced Judge Killits to have shown from the first that he was favorable to the railroad, had criticised somewhat ignorantly a ruling said to put the burden of proof on the city, and had said that Killits and his press were unfair to the people, winding up "impeach Killits." I confess that I cannot find in all this or in the evidence in the case anything that would have affected a mind of reasonable fortitude, and still less can I find there anything that obstructed the administration of justice in any sense that I possibly can give to those words.

In the elaborate opinion that was delivered by Judge Killits to justify the judgment it is said "In this matter the record shows that the court endured the News-Bee's attacks upon suitors before it and upon the court itself, and carried all the embarrassment inevitable from these publications, for nearly six months before moving to vindicate its independence." It appears to me that this statement is enough to show that there was no emergency, that there was nothing that warranted a finding that the administration of justice was obstructed, or a resort to this summary proceeding, but that on the contrary when the matter was over, the judge thought that the "consistently unfriendly attitude against the court,", and the fact that the publications tended "to arouse distrust and dislike of the court," were sufficient to justify this information and a heavy fine. They may have been, but not, I think, in this form of trial. I would go as far as any man in favor of the sharpest and most summary enforcement of order in Court and obedience to decrees, but when there is no need for immediate action contempts are like any other breach of law and should be dealt with as the law

deals with other illegal acts. Action like the present in my opinion is wholly unwarranted by even color of law.

MR. JUSTICE BRANDEIS concurs in this opinion.