## UNITED STATES v. SULLENS.

District Court, S. D. Mississippi, Jackson Division. November 5, 1929.

236

Lester G. Fant, U. S. Atty., of Holly Springs, Miss.

W. H. Watkins, of Jackson, Miss., for defendant.

HOLMES, District Judge (after stating the facts as above). A consideration of the general principles applicable to criminal contempt is necessary to a legal analysis of the facts.

The power of courts under the ancient common law to punish for contempt was dealt with so far as the federal courts are concerned by the Act of March 2, 1831, 4 Stat. 487, which is now section 268 of the Judicial Code (28 USCA § 385), the pertinent provisions of which are as follows: "The said courts [United States Courts] shall have power * * '* to punish, by fine or imprisonment, at the discretion of the court, contempts of their authority: Provided, That such power to punish contempts shall not be construed to extend to any cases except the misbehavior of any person in their presence, or so near thereto as to obstruct the administration of justice. * * *"

The leading case on the subject is Toledo Newspaper Co. et al. v. United States, 247 U. S. 402, 38 S. Ct. 560, 62 L. Ed. 1186, in which the court held that said section 268 is merely declaratory of the inherent power of the federal courts to punish summarily for contempt, and does no more than express a limitation imposed by the Constitution. It announced that the test of the power is the character of the act done, and its direct tendency to prevent and obstruct the discharge of judicial duty. It held that comment and cartoons, having reference to pending judicial action, published at the place where the proceedings were pending, in a daily newspaper with a large circulation, may fairly be said to "obstruct the administration of justice," where such is the reasonable tendency of such publication, although it is not shown that the newspapers containing them were seen by the judge or were circulated in the courtroom, and although there is no proof that the mind of the judge in the particular case was influenced, or his purpose to do his duty obstructed or restrained, by the publication.

In Craig v. Hecht, 263 U. S. 277, 44 S. Ct. 103, 106, 68 L. Ed. 293, the court said: "The matter heard by Judge Mayer was an ordinary contempt proceeding and Toledo Newspaper Co. v. United States, 247 U. S. 402, 38 S. Ct. 560, 62 L. Ed. 1186, is enough to show that the District Court had power to entertain it, decide whether the evidence established an offense within the statute and determine petitioner's guilt or innocence."

Mr. Chief Justice Taft said:

"I concur fully in the opinion of the Court. It is of primary importance that the right freely to comment on and criticize the action, opinions and judgments of courts and judges should be preserved inviolate; but it is also essential that courts and judges should not be impeded in the conduct of judicial business by publications having the direct tendency and effect of obstructing the enforcement of their orders and judgments, *or of impairing the justice and impartiality of verdicts.* * * * If the publication is intended and calculated to obstruct and embarrass the court in a pending proceeding *in the matter of the rendition of an impartial verdict,* or in the carrying out of its orders and judgments, the court may, and it is its duty to protect the administration of justice by punishment of the offender for contempt.

"The federal statute concerning contempts as construed by this court in prior cases vests in the trial judge the jurisdiction to decide whether a publication is obstructive or defamatory only."

In the recent case of Sinclair v. United States, 279 U. S., at page 763, 49 S. Ct. 471, 476, 73 L. Ed. 938, the court reaffirmed Toledo Newspaper Co. v. United States, 247 U. S. 402, 38 S. Ct. 560, 62 L. Ed. 1186, and quoted from it as follows: "True, it is urged that, although the matters which were made the basis of the findings were published at the place where the proceedings were pending and under the circumstances which we have stated in a daily paper having large circulation, as it was not shown that they had been seen by the presiding judge or had been circulated in the court room, they did and could form no basis for an inference of guilt. But the situation is controlled by the reasonable tendencies of the acts done and not by extreme and substantially impossible assumptions on the subject. Again, it is said there is no proof that the mind of the judge was influenced or his purpose to do his duty obstructed or restrained by the publications and, therefore, there was no proof tending to show the wrong complained of. But here again not the influence upon the mind of the particular judge is the criterion but the reasonable tendency of the acts done to influence or bring about the baleful result is

the test. In other words, having regard to the powers conferred, to the protection of society, to the honest and fair administration of justice and to the evil to come from its obstruction, the wrong depends upon the tendency of the acts to accomplish this result without reference to the consideration of how far they may have been without influence in a particular case. The wrongdoer may not be heard to try the power of the judge to resist acts of obstruction and wrongdoing by him committed as a prelude to trial and punishment for his wrongful acts."

In the Sinclair Case, supra, the court further said:

"Under the doctrine so stated, we think the trial judge rightly held it unnecessary to allege or show actual contact between an operative of the detective agency and a juror, or that any juror had knowledge of being observed. The reasonable tendency of the acts done is the proper criterion. Neither actual effect produced upon the juror's mind nor his consciousness of extraneous influence was an essential element of the offense.

"That the acts here disclosed, and for which three of the appellants were certainly responsible, tended to obstruct the honest and fair administration of justice, we cannot doubt. The jury is an essential instrumentality—an appendage—of the court, the body ordained to pass upon guilt or innocence. Exercise of calm and informed judgment by its members is essential to proper enforcement of law."

In the light of these authorities, let us analyze the facts of the case on trial.

It is not claimed that the defendant intended to reflect upon any judge of this court, but the contention is that the publication was intended and calculated to obstruct and embarrass the court in a pending proceeding in the matter of the rendition of an impartial verdict.

The question is whether the defendant willfully wrote and published the article which in itself was reasonably calculated to prevent the rendition of an impartial verdict, or intentionally did so in reckless disregard of its consequences. There is no doubt that he intended to write the editorial and to publish it at a time when he was fully cognizant of its natural and probable consequences. To say that he did not intend to obstruct the administration of justice and to prevent a fair and impartial verdict is not a defense if such was the natural and probable consequence which a reasonable man should have expected to follow directly and proximately from the thing done.

When the article was published, court was in session, "the stage was set" (as the article itself said), and all was in readiness for the trial. Meridian was "filled to overflowing," and "late arrivals from Jackson last night encountered much trouble finding hotel accommodations." The editor was there in person to report the case. To buttonhole a juror and tell him that it was not altogether a case of whether the defendants were guilty or innocent, but whether the juror would be willing to encourage the establishment of a white Republican party in Mississippi, would clearly have been improper, and the defendant would not have thought of doing it. To write that much and more under his own name and print it on the front page of a large newspaper which circulates in the vicinity of the trial, and which is sold at public news stands and in the hotels of Meridian, was of equal, if not greater, harmful tendency toward the prevention of an impartial verdict, as the power of the printed page is stronger than the spoken word.

Even after Judge Cox had entered a mistrial and continued the cases because of the article, and before the cases had been disposed of, he republished the article with the additional comment that the evidence against Howard was weaker than that offered at Jackson last year when there was an acquittal; that he was still of the opinion that politics would influence the jurors in reaching their conclusions; and that "notwithstanding the result of the last Presidential election, the preservation of a white man's government in Mississippi is still an important issue, and we cannot maintain that form of government with a so-called white Republican party firmly entrenched in Mississippi, for it will inevitably mean the return of the negro as a menacing factor in political affairs."

In conclusion, he says: "If this be contempt of court, make the most of it."

This was written on March 22, with the cases reset for trial on April 7th, or about two weeks off.

The defendant says that he merely predicted a verdict of acquittal. He did more than this. He vigorously insisted that a verdict of guilty would overthrow the Democratic Party and white supremacy in Mississippi, which in the circumstances was reasonably calculated to obstruct the rendition of an impartial verdict. By a series

238

of publications he impregnated in the minds of the people from whom the jurors had to come the idea that Democratic predominance and white racial supremacy were dependent on the result of the trial and that a verdict of conviction might bring the negro back into power.

That an acquittal should be effected through race prejudice or partisan politics is reprehensible, but that a conviction might be brought about in the same way is destructive of the foundation principles of justice. If once the race issue in Mississippi may be used to bring about an acquittal, the next time it may be employed to secure a conviction, which might convert the jurors into a mob.

To publish broadcast in a responsible paper of large circulation the argument or prediction that white supremacy in Mississippi will be imperiled or affected by a particular verdict is calculated to prevent an impartial consideration of the case by a jury in this state. It would be difficult by anything printed in a newspaper to adopt a more effective method to influence improperly a jury's verdict than to impregnate in the minds of the people from whom the jurors are to be drawn the idea that racial supremacy, consciously or unconsciously, will be included in the result of the trial.

But the defendant claims a constitutional right to do what he did. As a newspaper man, he claims the right to comment freely on pending criminal proceedings. He admits no restrictions on this right. Trial by jury, due process of law, the liberty of the citizen, and every other sacred right of Magna Charta and the Constitution must give way to the freedom of the press, even to an abuse of that freedom. So strong was he in this claim or belief, that he repeatedly published similar articles.

But absolute rights are necessarily limited to avoid trespasses upon other rights of equal dignity.

The First Amendment safeguards freedom of speech as well as of the press, and, we have observed, to have spoken these things to waiting jurors would have been highly contemptuous.

The immunity of the press from laws abridging its freedom is not paramount to other privileges guaranteed the citizen under the Constitution. A contrary doctrine would destroy the right of trial by an impartial jury which the Constitution says the accused shall enjoy.

Trial by jury and the freedom of the press were coeval with, and are coequal under, the Constitution. Each is supreme in its own sphere. Properly understood, there should be no conflict between them.

That the article complained of was one of a series written by the defendant, which was intended and calculated to imbue the minds of the public, including prospective jurors, with the idea that racial and political supremacy were linked up with the result of the trial, is as certain as the inference that the defendant meant what he said. That the article was reasonably calculated to bring about a particular verdict, regardless of the guilt or innocence of the defendants on trial, is beyond all reasonable doubt. This was its reasonable and probable tendency, and renders the defendant guilty of contempt of court.

So much for the guilt or innocence of the defendant. What of the punishment, always a difficult question for the judge but a peculiarly delicate and unwelcome one in contempt proceedings because of the unusual discretion given him.

Ordinarily, the judge has a wide discretion in the fixation of punishment, but offenses are generally classified as felonies or misdemeanors, and maximum and minimum fines and imprisonments are fixed by statute.

In this regard criminal contempt is sui generis, neither the classification of the offense nor the amount of the punishment being set down by statute, or limited except by the facts of the case and the exercise of a sound judicial discretion.

The idea of punishment is corrective and not retaliatory. To deter others and reform the defendant are the primary considerations. That the editor thought he was within his rights as a newspaper man when he wrote the article is strongly maintained by his word and conduct, but that he was mistaken in this is equally clear from the authorities.

A mistake of law is no defense when the intention to do the thing prohibited is proven, but it is a matter to be taken into consideration in the exercise of the discretion mentioned.

The court should further take into consideration the character of the right to be preserved and the nature and frequency of the evil to be remedied; that is, the right of publicity and the evil of obstructing justice.

The administration of justice and the freedom of the press, though separate and distinct, are equally sacred, and neither should be violated by the other. The press and the courts have correlative rights and duties and should co-operate to uphold the principles of the Constitution and laws, from

which the former receives its prerogative and the latter its jurisdiction. The right of legitimate publicity must be scrupulously recognized and care taken at all times to avoid impinging upon it. In a clear case where it is necessary, in order to dispose of judicial business unhampered by publications which reasonably tend to impair the impartiality of verdicts, or otherwise obstruct the administration of justice, this court will not hesitate to exercise its undoubted power to punish for contempt. But the channels of justice may easily be polluted by a hostile press in a way beyond the reach of the law, and the difficulties which are sure to be incurred in administering so drastic a remedy, as well as the harm that is likely to result to the administration of justice, make it the duty of the court to try to avoid such action and obtain, if possible, the co-operation and assistance of the press in securing a fair and impartial administration of the law.

In short, this jurisdiction of punishing for contempt, being practically unlimited and potentially arbitrary, should be most zealously guarded by the courts and exercised by them with the greatest anxiety only in the most extreme cases where there is no other pertinent remedy which can be found in order to enable justice to be properly administered without pernicious interference.

This court must be permitted to proceed with the disposition of its business in an orderly manner free from outside interference obstructive of its constitutional functions. This right will be insisted upon as vital to an impartial court, and, as a last resort, as an individual exercises the right of self-defense, it will act to preserve its existence as an unprejudiced tribunal. But such a case as this has never before occurred in the history of the state, so far as I know, and it is hoped will never occur again.

For the first conviction of its kind, not only of the defendant but of any one in this state, a probationary sentence will be worth more than a punitive one if the press shall willingly understand that it may not obstruct or pollute the even flow of justice in a pending proceeding. This is therefore deemed a proper case for the application of the probation law.

Accordingly, the imposition of sentence will be suspended during good behavior, and the defendant placed on probation for a period of five years.

It is not intended to exercise any censorship over the editor of the Daily News, but probation as granted in this case means that, the defendant having in writing and in open court accepted the decision of the court as the law of the case and promised in good faith

not to commit another offense of a similar nature, only the commission by him of another such offense will be construed as a violation of its terms.