## HAWKINS v. UNITED STATES.

### No. 6301.

United States Court of Appeals,
Fourth Circuit.

Argued June 26, 1951.

Decided July 23, 1951.

Soper, Circuit Judge, dissented.

I. C. Crawford and George Pennell, Asheville, N. C., (Robert R. Reynolds, Asheville, N. C., on brief), for appellant.

Thomas A. Uzzell, Jr., U. S. Atty., Asheville, N. C., for appellee.

Before PARKER, Chief Judge, and SOPER and DOBIE, Circuit Judges.

DOBIE, Circuit Judge.

In the District Court of the United States for the Western District of North Carolina, Annie Hawkins was adjudged guilty of contempt of court by the District Judge, sitting without a jury, and sentenced to imprisonment for five months. She has appealed to us. The opinion of the District Judge, with findings of fact and conclusions of law, is not yet reported. We think the judgment below must be reversed.

The incidents out of which the contempt proceedings arose were connected with the trial of Fred Simpson, a Negro man, for conspiracy to violate the Internal Revenue Laws of the United States. Appellant, a Negro woman had been very friendly with Simpson, then their friendship cooled. Before the trial, however, these relations were again upon a very friendly basis. Appellant had given written statements to federal agents concerning the charges against Simpson. On the strength of these statements, which were far from favorable to Simpson, she was subpoenaed as a Government witness at his trial.

At this trial, however, she was introduced as a witness, not for the Government but for Simpson. In her testimony, she repudiated in almost every essential particular, the statements she had previously given to the federal agents.

On the morning of May 17, during the trial of Simpson, appellant sat in the court room next to, and talked with, Mrs. Kempton Mills, wife of Kempton Mills, a Negro man, who was a member of the jury trying Simpson. At the Noon recess, a number of Negroes attending the trial, including appellant, Juror Mills and Mrs. Mills, went for lunch to a small grocery store on Patton Avenue the main street of Asheville, very close to the federal court building. After lunch these parties returned to the court room and appellant sat with Mrs. Mills during the afternoon session. At the Noon recess on the following day, appellant and the juror Mills met at the grocery store, walked back to the court building and were observed sitting together and talking in the corridor just outside the court room.

During the conversation in the grocery store on May 18, appellant related to Mills how nice his wife had been to her and asked Mills whether or not his wife would mind the appellant walking up the street with him, to which Mills replied: "I am a man capable to take care of myself." The members of the jury had been instructed by the District Judge to allow no one to discuss the case with them.

In the contempt proceeding, appellant testified that at the time of her conversation and association with Mills, she did not know that he was a member of the jury trying Simpson. She denied that any act, deed or word of hers was in any way intended to influence Mills as a member of the jury and asserted that her walks back to the court room, and her association and conversation with Mills were merely the natural and casual consequences of the facts that they met at the grocery store and were returning to the court room at the same time.

What is much more important, appellant vigorously denied that, in her conversation with Mills, any mention whatever was made of the case on trial. In this

she was supported by Mills who testified that neither he nor appellant ever mention the case or trial and that no word concerning the trial ever passed between them. From the bench, the District Judge stated: "It is an unfortunate sort of thing. We will never know, as I recited in these findings of fact, what it was that was actually said between these parties, because what was said is only known between the two of them."

Appellant is an educated woman, about thirty-eight years old, who has taught in the public schools of the State of South Carolina. Apparently, however, she had little knowledge of familiarity with court proceedings, or just what is required or expected of jurors and witnesses.

■ There is much in the Government's brief before us, and something is said in the opinion below, to indicate that the appellant was guilty of perjury. While this charge might figure in the background of the proceedings before us, we are here concerned with the charge of contempt, on which appellant was adjudged guilty and sentenced. Cf. United States v. McGovern, 2 Cir., 60 F.2d 880. We do not think the record sustains this charge.

■ We agree with the Government's contention that if the words or acts were spoken or done with the intent to influence the juror and had such a tendency, it is not necessary for the Government to show that the juror was actually influenced by these words or acts. Toledo Newspaper Co. v. United States, 247 U.S. 402, 38 S.Ct. 560, 62 L.Ed. 1186; Conley v. United States, 8 Cir., 59 F.2d 929, 935; Kelly v. United States, 9 Cir., 250 F. 947. True it is, too, that the environment here is admissible and that we cannot reverse, if the findings below are supported by substantial evidence, merely because we might draw from this evidence a conclusion at variance with that reached by the trial judge. Burneson v. United States, 6 Cir., 19 F.2d 780.

Counsel for the Government rely heavily upon the well known case of Gridley v. United States, 6 Cir., 44 F.2d 716. From the opinion in that case, 44 F.2d at page 744, we quote:

"The evidence heard was the testimony of one of the two women jurors concerned and that of the appellant Roen. As to what took place there was not much difference in their testimony. According to the testimony of the woman juror, what took place was this: She and her co-juror, on the second day of the trial, at the noon recess, went to a certain hotel in Detroit about four blocks from the government building for lunch. Before going to lunch they went into the washroom and as they were about ready to leave the appellants came in. She heard a voice behind her when she saw came from appellant Wright saying, 'Perhaps I ought to say I am Mrs. Wright so that you won't be talking about the case.' She saw them come in, and this statement was made as quick as they entered. She did not make answer, but her co-juror said, 'Well, I guess we know who Mrs. Wright is.' Appellant Roen then spoke up and said: 'I do not know that it would be proper, but I would like to introduce you to Mrs. Wright. She has been a very dear friend to me and just like a mother.' Appellant Wright then spoke up and said, 'Well, anyway, whether we are introduced or not, we want you to know that we have a very intelligent jury.' This was all that was said. She testified that before appellant Wright started that conversation she and her co-juror were not talking about the case.
* * *

"In so far as there was misbehavior on the part of the appellant Roen, it was in telling the jurors how dear appellant Wright was to her. And as to the appellant Wright it was in complimenting the jury."

Mrs. Wright was on trial for using the mails to defraud, while Mrs. Roen, her very good friend, was constantly in her company. That case is readily distinguishable from the case before us. There it is clear that appellants Wright and Roen did talk about the case to the two women jurors and the fair inference is that what was said by Wright and Roen was said with the intention of influencing the jurors in their verdict. The same is true in Higgins v. United States, 81 U.S.App.D.

C. 372, 160 F.2d 223. From that case, 160 F.2d at page 224, we quote:

"One of the women jurors left the court room, and was in the hallway some thirty feet from the door, when appellant, whom the juror recognized as the mother of the defendant in the case then on trial, came up behind her and said 'My boy, my boy', and then something about having some ten or more sons in the war."

The conduct of the appellant here induced the District Court to declare a mistrial in the case against Simpson. Further, appellant's conduct, particularly when viewed against the whole background, was such as would naturally give rise to grave suspicion that she was trying to influence the verdict of juror Mills in the case against her friend, Simpson. But more than grave suspicion is needed for conviction here. We think there was not substantial evidence justifying the findings of the District Court that appellant was guilty of contempt.

There was no evidence to show that appellant deliberately brought about her meetings with Mills. The little grocery store appears to have been the natural and most convenient place at which Negroes could procure lunch. It was not unnatural (though quite unfortunate) that appellant and Mills, having met there by chance, should walk back to the court building together. Again, if appellant possessed any ulterior motives, it hardly seems probable that she would have selected as places for her conversation with juror Mills, Patton Avenue, the main street of Asheville (in broad daylight) and the corridor of the court building where she and Mills could readily be seen by all those connected with, or attendant upon, the trial of Simpson.

█ We would not go so far as to say that an adjudication for contempt in the instant case could only be based upon evidence showing that the appellant specifically discussed the case on trial with the juror, Mills. If the evidence established an attempt on her part to influence the juror's verdict in any way, this would be sufficient; but there is nothing in the evidence to jus-

tify a finding that appellant was engaged in an attempt to influence the verdict of the juror. The fact that she talked with him or that she walked with him is manifestly not sufficient, and that is all that was disclosed by the evidence.

For the reasons stated, the judgment of the District Court is reversed.

Reversed.

SOPER, Circuit Judge (dissenting).

Chief Justice White pointed out in Toledo Newspaper Co. v. United States, 247 U. S. 402, 419, 420, 38 S.Ct. 560, 564, 62 L. Ed. 1186, that the federal courts in the exercise of their rights of self preservation have the power to restrain acts tending to obstruct and prevent the untrammelled and unprejudiced exercise of the judicial power by summarily treating such acts as contempt and punishing them accordingly. He said that the test is the character of the act done and its direct tendency to prevent and obstruct the discharge of the judicial duty; and that the power of an appellate court in reviewing a conviction of contempt by the trial judge "is not to test divergent contentions as to the weight of the evidence but simply to consider the legal question whether the evidentiary facts found had any reasonable tendency to sustain the general conclusions of fact based upon them by the courts below."

In the pending case the evidence had a reasonable tendency to establish the following facts which led the District Judge to conclude that the appellant was endeavoring to set up a friendly relationship with one of the jurors so as to influence his verdict in the case on trial. Annie Hawkins was a woman 38 years of age, of more than ordinary intelligence and experience. She had been educated in Allen University in South Carolina and had taught school in that state for eight years. Subsequently she worked in the Veterans Hospital at Swannanoa, North Carolina, and later purchased two automobiles and operated a taxicab business in Asheville. She had been personally attached to Fred Simpson,

the defendant in the criminal case on trial, and regarded him as her sweetheart; but there had been a falling out between them and she had turned against him and called the government agents and made statements which were taken down in shorthand to the effect that Simpson was engaged in illegal liquor traffic. Accordingly she was summoned as a witness for the United States in the case before the court; but in the meantime and unknown to the government she had made up her differences with Simpson and was willing to testify in his behalf. She was actually put on the stand as a witness for the defendant, after her attentions to the juror had been noticed and after she had been questioned by the United States Attorney and had repudiated her former statements. As a witness for the defendant she falsely swore that she had never made these statements.

This was the setting in which the woman struck up an acquaintance with a member of the jury of her own race whom she had not known before. Although there were many colored people in the courtroom, she found a seat next to the juror's wife and made her acquaintance. Although there was only one place in the city convenient to the courtroom where colored persons could purchase food at lunch time, and a number of them went to this place at recess on the second day of the trial, she went in company with the juror and his wife, and returned with them to the courtroom. The next day, under like conditions, the juror's wife being absent, Annie Hawkins again went to the same store with the juror and returned with him taking a round about route from the store to the courthouse. On this occasion she addressed him by his name. Arriving there she sat with him on a bench in the corridor and engaged him in a conversation. Although the conversations between them on these two days were not overheard, her actions and her posture on the second day indicated to the government agents and convinced the judge that she was endeavoring to ingratiate herself with the juror.

These circumstances and the inadequacy of her explanations when examined as a witness produced a most unfavorable impression upon the judge so that he felt it necessary to declare a mistrial in an important criminal case and to adjudicate the woman in contempt. She said that when she sat down beside the wife of the juror in the courtroom she was unaware of the relationship of her new acquaintance to the juror; that when she went out to lunch with the juror she did not know that he was a member of the jury; and when she took the stand she failed to identify the juror as her luncheon companion, although she had eaten lunch with him on two successive days and had addressed him by his name. She gave no account of the subject of her several conversations with the juror except to say that she told him about an accident to her sister who had burned her hand and on the second day talked to him about his wife. The testimony of credible witnesses tended strongly to show that she perjured herself in repudiating her earlier statements to the revenue agents and in denying any knowledge of the identity of the juror who sat upon the panel throughout the two days of the trial during which she was constantly present. The judge not unreasonably rejected her explanations of her conduct as incredible and concluded that she was not merely maintaining a friendly attitude towards a casual stranger, but was engaged in a sinister attempt to curry favor with one who had a voice in the verdict in order to aid the defendant.

In my opinion, the behavior of the appellant, when viewed in the light of her obvious motive for making contact with the jury, had a direct tendency to prevent and obstruct the administration of justice, and therefore the order of the District Court should be affirmed. Higgins v. United States, 81 U.S.App.D.C. 372, 160 F.2d 223; Gridley v. United States, 6 Cir., 44 F.2d 716; Murphy v. Wright, 167 Iowa 75, 148 N.W. 985. See Kelly v. United States, 9 Cir., 250 F. 947; Annotation, 63 A.L.R. 1269, 1277. Cf. State ex inf. Kimbrell v. Clark, 134 Mo.App. 55, 114 S.W. 536.