## UNITED STATES v. CRAIG.

· (District Court, S. D. New York.   March 8, 1920.)˙

**1. Contempt ⬡29—Administrative officers not privileged to commit contempt of court.**

While an administrative officer is not liable civilly for-acts done or statements made in course of official duty, he is not privileged to commit a contempt of court.

**2. Contempt ⬡2—Obstructing administration of justice.**

In order to constitute a "contempt" of court, within Judicial Code, § 268 (Comp. St. § 1245), by such misbehavior as to obstruct the administration of justice, it is not necessary that it should be directed to any definite or particular matter then pending for decision, nor is it material whether or not it in fact influenced the court.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Contempt.]

**3. Contempt ⬡9—Letter making false charges against judge in pending causes constitutes contempt.**

A letter written and made public by the comptroller of the city of New York at a time when a number of suits were pending in a federal court against transportation companies of the city in which receivers had been appointed who were operating the lines, and various matters were from time to time coming before the court for decision, containing a false charge that the judge was responsible for a policy of denying to the writer and other members of the board of estimate and apportionment any access to original sources of information concerning the property and affairs of the companies *held* to constitute a contempt of the court, within Judicial Code, § 268 (Comp. St. § 1245), as misbehavior so near the court as to obstruct the administration of justice.

Proceeding for contempt by the United States against Charles L. Craig.   On demurrer to information.   Overruled.

.Francis G. Caffey, U. S. Atty., and Ben. A. Matthews and David V. Cahill, Asst. U. S. Attys., all of New York City.

William P. Burr, Corp. Counsel, of New York City (Edmund L. Mooney, William E. C. Mayer, William C. Fitts, Charles T. B. Rowe, and Alfred B. Cruikshank, all of New York City, of counsel), for defendant.

MAYER, District Judge.   Defendant has demurred to the information charging him with contempt of court and has set forth 28 grounds of demurrer.   It will not be necessary to refer in detail to all the contentions urged in support of the demurrer.

The proceeding against defendant is brought under section 268 of the Judicial Code (Comp. St. § 1245), which is in part as follows:

"The said courts [United States courts] shall have power * * * to punish, by fine or imprisonment, at the discretion of the court, contempts of their authority: Provided, that such power to punish for contempts shall not be construed to extend to any cases except the misbehavior of any person in their presence, or so near thereto as to obstruct the administration of justice. * * *"

The contemptuous writing charged is contained in a letter alleged to have been written under date of October 6, 1919, and caused to be

delivered to the public service commissioner in response to an invitation to a conference in respect of the transportation situation in the city of New York. Two extracts from the letter will illustrate the difference between free and legally allowable criticism, on the one hand, and statements charged to be contemptuous, on the other.

Referring to refusal of this court to appoint at the time an additional or coreceiver "acceptable to the board of estimate and apportionment" in equity suits under which certain railroad properties came into the custody of this court, the letter of October 6, 1919, set forth, among other things,

"As you must be aware, it is a very common thing in large receiverships to appoint additional receivers, particularly where there are varied and conflicting interests; and I have never been able to understand why, in a matter of great public concern such as this, Judge Mayer set himself against it."

Defendant had full right to make the observation supra. The right to criticize the correctness of the decisions of courts and judges has always existed under our form of government, and must continue to exist, not merely as a right possessed by the individual, but as a safeguard to our institutions. Such criticism often invites valuable discussion and deliberation, and not infrequently results in correcting error. But such right must not be confused with "the misbehavior * * * so near" the presence of the court "as to obstruct the administration of justice." Of this latter conduct the following from the letter of October 6, 1919, is a sufficient illustration:

"Before any such conference can be seriously considered, and as an evidence of good faith on the part of those acting by and under the authority of United States District Judge Mayer, there must be a reversal of the policy for which Judge Mayer is responsible of denying to myself and other members of the board of estimate and apportionment any access to original sources of information concerning the property and affairs of these various public utility corporations holding franchises to operate in the streets of New York."

It is alleged in the information, inter alia:

"Neither the defendant nor any member or members of the board of estimate and apportionment, nor any other authorized representative of the city of New York, has ever been denied by this court, or by any one acting under its authority, or by either of said receivers, or by the said trustee, or by any authorized representative of either of said receivers or of said trustee, access to any original or other source of information concerning any of the property or affairs of any public utility corporation holding any franchise from, or any franchise to operate over, on, or under any street of, the city of New York. * * *

"1. In said letter it was stated that this court in the said suits and proceeding was responsible for a policy of denying to the defendant and to other members of the board of estimate and apportionment of the city of New York any access to original sources of information concerning the property and affairs of the various public utility corporations in the hands of receivers appointed by this court and holding franchises to operate in the streets of New York; whereas, in truth and in fact, this court never adopted such a policy, but, on the contrary, afforded to the defendant and to all members of the board of estimate and apportionment of the city of New York access to the said original sources of information, and every facility for obtaining information concerning the property and affairs of the said corporation, and expressly directed that the city of New York and its officials should have access to such information, and in truth and in fact at no time since this court assumed jurisdiction of any of said corporations as aforesaid has this

court, or any one acting under its authority, ever denied to the defendant, or to any member of the board of estimate and apportionment, or to any authorized representative of the city of New York, or of any of its officials, access to original or to any other sources of information concerning the property or affairs of any of said corporations. ＊ ＊ ＊

"All of the foregoing statements in said letter, numbered from 1 to 4, inclusive, and each of them, are and were false, and were known by the defendant to be false when made, and were made in reckless disregard of the truth.

"In addition to the statements above enumerated, the defendant by such letter intended to charge, and willfully, knowingly, unlawfully, falsely, and contemptuously therein and thereby did charge, that the court concealed the truth from the public and public officials, and kept hidden facts which, in order to protect the public interests, should have been known to the public and public officials; whereas, in truth and in fact this court did not conceal the truth, or keep any facts hidden, from the public or from any public official, but, on the contrary, prior to the writing of said letter, this court ordered and directed that there should be given to the public and public officials every opportunity to ascertain the truth and every facility which might aid in revealing the truth, and caused the corporation counsel for the city of New York to be served with notice of all proceedings in said suits other than those relating to the ordinary current administration of said receiverships."

Expressed in simple language, what the information charges is that the part of the letter quoted was knowingly false, and that the court never denied access to original sources of information, but had ordered and directed the contrary course.

Read with the entire context, there is no escape from the conclusion that the letter in this respect charged a court of justice with adopting a policy which denied to public officials access to original sources of information to which such public officials were entitled. On demurrer, the court can look only to the face of the writing, and is not enlightened as to what was in the mind of the defendant, as distinguished from what was expressed by him in writing.

Such a charge is, indeed, grave. If true, the court which sanctions such a course is rightly subject at least to serious criticism. If false, he who is responsible for the utterance has undertaken a serious responsibility in publishing that which, if believed, must bring a court into contempt and distrust, and in any event must create doubt in the minds of the uninformed as to the propriety and right of the court's conduct.

The question, then, is whether such writing, alleged to be knowingly false, constitutes the contempt denounced by section 268 of the Judicial Code. Since the decision in Toledo Newspaper Co. v. United States, 247 U. S. 402, 38 Sup. Ct. 560, 62 L. Ed. 1186, there is no longer any question that it is not necessary that the contempt be committed in the physical presence of the court, nor in the courthouse itself, nor in its corridors. The holding to the contrary in the case of In re Daniels (C. C.) 131 Fed. 95, was, in effect, overruled by the Toledo Newspaper Co. Case, supra, and there can no longer be any doubt that, if the other elements of contempt exist, the misbehavior, although it did not take place in the physical presence of the court, did occur "so near thereto" as to subject the defendant to the jurisdiction of this court, under the doctrine of the Toledo Case.

[1] It is contended, however, that defendant in his capacity as

comptroller of the city of New York was entitled to what his counsel speak of as "political privilege," or, to use the language of their brief:

"The letter of the defendant comptroller * * * was the subject of absolute privilege."

This point might, on demurrer, be disregarded, for the reasons set forth in the opinion of this court dated December 23, 1919; but, as it is pressed again, it may as well be disposed of. The case before the court is not one of civil liability, as were Spalding v. Vilas, 161 U. S. 483, 16 Sup. Ct. 631, 40 L. Ed. 780, De Arnaud v. Ainsworth, 24 App. D. C. 167, 5 L. R. A. (N. S.) 163, Farr v. Valentine, 38 App. D. C. 413, Ann. Cas. 1913C, 821, and Chatterton v. Secretary of State, 2 Q. B. 189. In these cases, it was sought to hold public officials in money damage in connection with writings published in the performance of their duties. The privilege accorded as a necessary protection is thus summed up in the Spalding Case, supra:

"We are of opinion that the same general considerations of public policy and convenience which demand for judges of courts of superior jurisdiction immunity from civil suits for damages arising from acts done by them in the course of the performance of their judicial functions apply to a large extent to official communications made by heads of executive departments when engaged in the discharge of duties imposed upon them by law. The interests of the people require that due protection be accorded to them in respect of their official acts. As in the case of a judicial officer, we recognize a distinction between action taken by the head of a department in reference to matters which are manifestly or palpably beyond his authority, and action having more or less connection with the general matters committed by law to his control or supervision. Whatever difficulty may arise in applying these principles to particular cases, in which the rights of the citizen may have been materially impaired by the inconsiderate or wrongful action of the head of a department, it is clear—and the present case requires nothing more to be determined—that he cannot be held liable to a civil suit for damages on account of official communications made by him pursuant to an act of Congress, and in respect of matters within his authority, by reason of any personal motive that might be alleged to have prompted his action; for personal motives cannot be imputed to duly authorized official conduct. In exercising the functions of his office, the head of an executive department, keeping within the limits of his authority, should not be under an apprehension that the motives that control his official conduct may at any time become the subject of inquiry in a civil suit for damages. It would seriously cripple the proper and effective administration of public affairs, as intrusted to the executive branch of the government, if he were subjected to any such restraint. He may have legal authority to act, but he may have such large discretion in the premises that it will not always be his absolute duty to exercise the authority with which he is invested. But if he acts, having authority, his conduct cannot be made the foundation of a suit against him personally for damages, even if the circumstances show that he is not disagreeably impressed by the fact that his action injuriously affects the claims of particular individuals."

But neither in the cases above cited nor in any other case in the American or English Reports can there be found any decision which holds that there is a privilege, absolute or qualified, to commit contempt of court. Nor is there any analogy between misbehavior in the sense of section 268 of the Judicial Code and the publication or utterance of the written or spoken word which may constitute libel or slander. In the one case, the courts are impersonal, and are concerned only with—

"the misbehavior of any person in their presence or so near thereto as to obstruct the administration of justice."

In the other case, the injury is individual to him who is libeled or slandered, and a case might conceivably arise where a person might be guilty of contempt of court, and yet not be liable in damages as for libel or slander to the judge in respect of whose court he has committed contempt. Nor is the comptroller of the city of New York clothed with any privilege which will protect him for acts committed in contempt of court. He is not a member of the Legislature, even though it may be urged that the board of which he is a member has certain delegated powers in the nature of legislative functions; and, indeed, for that matter, no one would contend that a member of the Legislature would be free to commit contempt of court by misbehavior outside the halls of the legislative body in any manner he pleased as to the act or conduct of any court or judge.

[2] It is further contended that, as the information does not set forth that any particular motion or other particular matter was then awaiting decision, it follows that the information fails to set forth any act of contempt. This argument proceeds upon the theory that, although an action or suit is pending, contempt can only be committed if the misbehavior is directed to a definite matter which is to be disposed of by the court's order, judgment, or decree, dealing with that precise subject-matter.

[3] In the case at bar, the information sets forth that two consolidated causes in equity and one bankruptcy proceeding were pending in this court on October 6, 1919. By virtue of the equity causes (the information shows) there came into the custody of the court large and extensive properties of public utilities, subway, elevated, and surface transit lines. It is plain that in the equity causes and the bankruptcy proceeding the court would be called upon from time to time to make orders and decrees. Such orders and decrees would not merely affect the property as such, but necessarily affect the relation of the property to the public.

The very nature of the properties and the legal proceedings involving them cast upon the court from the beginning a continuing duty, which must necessarily be performed through the agency of orders, instructions, and decrees decided upon from time to time and expressed in such form as may be appropriate. Until, therefore, the property is no longer in the court, and the court by its final decree or proper order has released the property from its custody, and has no further duty to perform, the equity suits and the bankruptcy proceeding are in every sense pending.

If the act or conduct attacked has been completed and is not susceptible of change, it may be contended with considerable merit that the attack can no longer "obstruct the administration of justice." It is also true that many of the cases have occurred where a particular subject-matter was literally sub judice. Naturally, cases of contempt arise most frequently with reference to a particular subject or point of controversy. But, bearing in mind all that has been so definitely said in the opinion of the Chief Justice in the Toledo Case, supra, the

test really is not whether the "misbehavior" is directed against the decision of a particular question sub judice, but whether it is of such a kind as to be obstructive of the administration of justice. See, also, Ex parte McLeod, 120 Fed. 130; Ex parte Hudgins, 249 U. S. at page 383, 39 Sup. Ct. 337, 63 L. Ed. 656; U. S. v. Shipp, 203 U. S. at page 574, 27 Sup. Ct. 165, 51 L. Ed. 319, 8 Ann. Cas. 265. As stated by the United States attorney:

"But, so far as can be discovered, in no case has it ever been held that, in order to constitute contempt, the particular matter with which the court was concerned must in fact have been then in its mind for future action. So narrow and precise a subdivision of the steps in a cause would, it is submitted, make a farce of the authority and duty of the courts to maintain their dignity and enforce opportunity for the exercise of their lawful powers in orderly fashion. * * * The only method by which actual substance can be given to an effective use made of the indisputable power of the court to prevent attempts at interference with the free exercise of its functions in a cause is, upon consideration of the nature of the cause itself and the character of the comment or conduct involved, to determine in each instance whether or not the comment or conduct is such that the natural tendency would be to influence or bring about 'the baleful result' which is prohibited. This is the governing principle in every well-considered or authoritative decision on the subject. It is believed that there is not to be found in the books anything to the contrary, either in the form of deliberate statement of the law or of action by a court."

See, also, In re Chadwick, 109 Mich. 588, 67 N. W. 1071; People v. News-Times Publishing Co., 35 Colo. 253, 84 Pac. 912; Patterson v. Colorado, 205 U. S. at page 460, 27 Sup. Ct. 556, 51 L. Ed. 879, 10 Ann. Cas. 689.

Finally, examining the information, it appears that it is alleged that the court was falsely charged in effect with a policy or course of conduct by which it denied to public officials access to original sources of information. It will be noted that defendant refers to "the policy" for which the court is responsible. Indeed, counsel for defendant assert in their brief:

"The information itself discloses on its face that Judge Mayer had adopted a settled policy and a fixed purpose in regard to the character of the information to be accorded by the receivers and the trustee to the city officials."

But counsel contend that this action of the court was "presently final." It must be plain that "policy" means a continuing course in a pending cause, and the alleged false statement in respect thereof looked to the present and the future, as well as the past. But it is not necessary to place the decision of this question on either narrow or technical ground. The question is broader and reaches further.

Such statements as are alleged in the information to be knowingly false have, for their purpose and expected effect, the creation of a fear in the mind of the court that it will invite popular distrust, and perhaps condemnation, if it continues the course which it has pursued. The assault is based on the assumption—fortunately rarely correct—that the court will shape its decisions to meet passing popular approval and to avoid passing popular criticism. It is intended to play on human frailty, and to deflect and deter the court from the performance of its duty, and drive it into a compromise with its own unfettered

judgment, by placing it, through the medium of knowingly false assertion, in a wrong position before a public which has little opportunity to investigate the facts and ascertain the truth.

Such conduct, however futile in its results, clearly constitutes "an obstruction to the administration of justice." All the problems of a pending cause, and, in a larger sense, the community itself, are entitled to the free and unaffected exercise of that judgment which, under the Constitution, has been confided to the courts. As said by Mr. Justice Holmes in Patterson v. Colorado, supra:

"When a case is finished, the courts are subject to the same criticism as other people, but the propriety and necessity of preventing interference with the course of justice by premature statement, argument, or intimidation hardly can be denied."

The question is not whether, as matter of fact, the court has been or will be deterred from the performance of its duty; but, as said by Mr. Chief Justice White:

"The test, therefore, is the character of the act done and its direct tendency to prevent and obstruct the discharge of judicial duty. * * * Again, it is said there is no proof that the mind of the judge was influenced or his purpose to do his duty obstructed or restrained by the publications, and therefore there was no proof tending to show the wrong complained of. But here again not the influence upon the mind of the particular judge is the criterion, but the reasonable tendency of the acts done to influence or bring about the baleful result is the test. In other words, having regard to the powers conferred, to the protection of society, to the honest and fair administration of justice and to the evil to come from its obstruction, the wrong depends upon the tendency of the acts to accomplish this result without reference to the consideration of how far they may have been without influence in a particular case. The wrongdoer may not be heard to try the power of the judge to resist acts of obstruction and wrongdoing by him committed as a prelude to trial and punishment for his wrongful acts." Toledo Newspaper Co. v. U. S., 247 U. S. 419, 421, 38 Sup. Ct. 560, 62 L. Ed. 1186.

Being of the opinion, therefore, that the information sets forth facts constituting "misbehavior" of the defendant "so near" to the presence of the court "as to obstruct the administration of justice," the demurrer is overruled.

Monday, March 15, 1920, at 10:30 a. m., in room 331, Federal Building is fixed as the time and place to plead to the information. Settle order on one day's notice.