## UNITED STATES v. CRAIG.

(District Court, S. D. New York. February 14, 1921.)

1. Contempt ⊜⊃8—Court does not interfere with right of free criticism.

Ordinarily the court does not concern itself with personal attacks nor interfere with the fullest exercise of the right to criticize freely.

2. Contempt ⊜⊃8—Charge court denied public officials right to information concerning utilities under receivership tends to intimidate court.

A charge by a city official that the court was denying the right of the officials to any access to original sources of information in respect to transit companies for whom receivers had been appointed by the court is one of the gravest charges which could be made against the court, since the principle that justice should be administered in the open is firmly established, and a charge to the contrary would create distrust of the courts, so that such charge, if false, must be intended to intimidate the judge into a course contrary to what he deems proper and just.

3. Contempt ⊜⊃8—Facts held to show publication of letter containing contempt.

Proof that a letter containing the charges against the court on which the information for contempt was based had been read by defendant to a municipal committee of which he was a member, had been sent to the Public Service Commissioner, whose practice it was to keep such letters on public file, and had thereby reached the newspapers, which published it, establishes publication of the contempt by defendant.

4. Contempt ⊜⊃8—Facts held to show charge court denied access to information was false.

A charge on which proceedings for contempt were instituted against the author that the court which had appointed receivers for traction companies was denying the city officials any access to the original sources of information from which the situation of the traction companies could be determined was false where defendant admitted he had never made any application for access to any information in the hands of the receivers, but had based his statements upon the denial of an application for his appointment as additional receiver, which appointment he regarded as essential to give him full access to the information sought.

5. Contempt ⊜⊃8—Person is responsible for statement whose plain meaning obstructs justice, though no contempt was intended.

A person who made a statement concerning the court, the plain meaning of which necessarily obstructed the administration of justice in the court, is responsible for the natural consequences of his act, and is guilty of contempt for which he will be punished unless he makes reparation by filing an unqualified retraction of the false statements on which the charge was based.

⊜⊃For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Contempt proceedings by the United States against Charles L. Craig. Defendant adjudged guilty of contempt.

See, also, 266 Fed. 230.

Francis G. Caffey, U. S. Atty., and Ben A. Matthews, Asst. U. S. Atty., both of New York City.

John P. O'Brien, Corp. Counsel, of New York City (Edmund L. Mooney, Charles T. B. Rowe, Alfred B. Cruikshank, Russell Lord Tarbox, and Eli S. Wolbarst, all of New York City, of counsel), for defendant.

MAYER, District Judge. On October 1, 1919, Lewis Nixon, then Public Service Commissioner, addressed identical letters to the members of the board of estimate and apportionment of the city of New York, to receivers appointed by this court, to transit officials, and to representatives of security holders inviting them to attend a conference to be held at the office of the Public Service Commission at 10:30 of the morning of October 6, 1919.

Defendant received one of these letters, a copy of which is annexed as Appendix A.

On October 6, 1919 at 10:40 a. m., as appears from the minutes of the Public Service Commission, the conference began, but defendant was not among those present. After some discussion, it was concluded by the Public Service Commissioner, in response to views expressed by the transit construction commissioner, that a full and free consideration of the subject-matter and the questions involved could more effectively be undertaken in a closed conference, and thereupon, as the minutes state, "various spectators and newspaper men left the room." After this had occurred, further discussion took place, and then the Public Service Commissioner said:

"I have received a letter from Mr. Craig, the comptroller, and I think I will read it as explaining his reasons for not meeting here with us."

The letter referred to was thereupon read by the Public Service Commissioner. A copy is hereto attached as Appendix B.

Thereafter, and on the same day, October 6, 1919, the court filed the following order:

"It is hereby ordered that the United States attorney advise the court by formal information concerning the conduct of one Charles L. Craig on October 6, 1919, at which time he is reported to have published or caused to be published a written communication addressed to Hon. Lewis Nixon, Public Service Commissioner, No. 49 Lafayette street, New York City, concerning the orders and action of this court in a pending cause or causes."

On November 3, 1919, the United States attorney filed an information charging defendant with contempt of court. After a recital of the facts, the information alleged, among other things, the following:

"(1) In said letter it was stated that this court in the said suits and proceeding was responsible for a policy of denying to the defendant and to other members of the board of estimate and apportionment of the city of New York any access to original sources of information concerning the property and affairs of the various public utility corporations in the hands of receivers appointed by this court and holding franchises to operate in the streets of New York; whereas in truth and in fact this court never adopted such a policy,

but on the contrary, afforded to the defendant and to all members of the board of estimate and apportionment of the city of New York access to the said original sources of information and every facility for obtaining information concerning the property and affairs of the said corporations, and expressly directed that the city of New York and its officials should have access to such information, and in truth and in fact at no time since this court assumed jurisdiction of any of said corporations as aforesaid has this court or any one acting under its authority ever denied to the defendant or to any member of the board of estimate and apportionment, or to any authorized representative of the city of New York or of any of its officials, access to original or to any other sources of information concerning the property or affairs of any of said corporations.

"(2) In said letter it was stated that this court made orders which precluded any application being made by the authorities of the city of New York to any other court or judge for any right of examination into the affairs or conditions of the said public utility corporations; whereas in truth and in fact this court has never made any such order, and, on the contrary, prior to the writing of said letter, this court expressly ordered and directed that there should be given to the authorities of the city of New York every opportunity and facility for making such examination.

"(3) In said letter it was stated that the orders of this court denied to the authorities of the city of New York the opportunity to ascertain the truth; whereas in truth and in fact this court has never made any such order and has never made any order that has, has had, or could have such effect, but, on the contrary prior to the writing of said letter this court ordered and directed that there should be afforded to the authorities of the city of New York every opportunity and facility for ascertaining the truth.

"(4) In said letter it was stated that an order of this court stands between the public and the truth; whereas in truth and in fact no order that this court has made has, has had, or could have such effect, but, on the contrary, every order in the above-mentioned suits and proceeding tended and was designed to place the public in possession of the truth and prior to the writing of said letter this court expressly ordered and directed that every facility be afforded to public officials and citizens' associations to satisfy themselves in respect of the financial and other conditions existing in relation to the corporations in charge of said receivers."

It was then alleged that—

"All of the foregoing statements in said letter, numbered from 1 to 4, inclusive, and each of them, are and were false and were known by the defendant to be false when made and were made in reckless disregard of the truth."

Thereafter an order to show cause was signed by the court requiring defendant to show cause on December 2, 1919, "why he should not be declared and adjudged in contempt of this court by reason of the facts set forth in the said information."

Counsel for defendant appeared specially and raised certain questions as to the jurisdiction of the court, which were decided adversely to defendant. The opinion of the court in this regard was dated December 23, 1919. The court then set December 29, 1919, as the date for the appearance of defendant.

Defendant's next step was to demur to the information on 28 grounds. The court overruled the demurrer and filed its opinion, dated March 8, 1920, in respect of the questions raised by the demurrer, and ordered defendant to plead to the information on March 15, 1920. United States v. Craig (D. C.) 266 Fed. 230.

Defendant pleaded not guilty, and the trial of the case began on May 10, 1920, and was concluded on June 10, 1920. The testimony is

transcribed in 791 pages of stenographer's minutes, and the exhibits are many and voluminous. In response to the request of counsel and in view of the length of the record and the many exhibits, the court set a date in the fall for the submission of briefs. Extensions beyond the original date set were asked for and granted. The reply brief of defendant is dated October 30, 1920, and briefs were finally submitted to the court shortly thereafter.

In United States v. Craig, supra, the court pointed out the grounds upon which the letter of defendant, considered by itself, must be regarded as contemptuous in certain respects. There are certain parts of the letter which are within the domain of free and permissible criticism. There are certain other parts which are not.

In the opinion supra the court stated, among other things:

"The proceeding against defendant is brought under section 268 of the Judicial Code, * * * which is in part as follows: 'The said courts (United States courts) shall have power * * * to punish, by fine or imprisonment, at the discretion of the court, contempts of their authority: Provided, that such power to punish for contempts shall not be construed to extend to any cases except the misbehavior of any person in their presence, or so near thereto as to obstruct the administration of justice. * * *'

"The right to criticize the correctness of the decisions of courts and judges has always existed under our form of government, and must continue to exist, not merely as a right possessed by the individual, but as a safeguard to our institutions. * * *

"But such right must not be confused with the 'the misbehaviour * * * so near' the presence of the court 'as to obstruct the administration of justice.' Of this latter conduct the following from the letter of October 6, 1919, is a sufficient illustration: 'Before any such conference can be seriously considered, and as an evidence of good faith on the part of those acting by and under the authority of United States District Judge Mayer, there must be a reversal of the policy for which Judge Mayer is responsible, of denying to myself and other members of the board of estimate and apportionment any access to original sources of information concerning the property and affairs of these various public utility corporations holding franchises to operate in the streets of New York.' * * *

"Read with the entire context, there is no escape from the conclusion that the letter in this respect charged a court of justice with adopting a policy which denied to public officials access to original sources of information to which such public officials were entitled. On demurrer, the court can look only to the face of the writing, and is not enlightened as to what was in the mind of the defendant, as distinguished from what was expressed by him in writing.

"Such a charge is, indeed, grave. If true, the court which sanctions such a course is rightly subject, at least, to serious criticism. If false he who is responsible for the utterance has undertaken a serious responsibility in publishing that which if believed, must bring a court into contempt and distrust and in any event must create doubt in the minds of the uninformed as to the propriety and right of the court's conduct. * * *

"It must be plain that 'policy' means a continuing course in a pending cause, and the alleged false statement in respect thereof looked to the present and the future, as well as the past. But it is not necessary to place the decision of this question on either narrow or technical ground. The question is broader and reaches further.

"Such statements as are alleged in the information to be knowingly false have, for their purpose and expected effect, the creation of a fear in the mind of the court that it will invite popular distrust, and perhaps condemnation if it continues the course which it has pursued. The assault is based on the assumption—fortunately rarely correct—that the court will shape its decisions to meet passing popular approval and to avoid passing popular criti-

cism. It is intended to play on human frailty, and to deflect and deter the court from the performance of its duty, and drive it into a compromise with its own unfettered judgment, by placing it, through the medium of knowingly false assertion, in a wrong position before a public which has little opportunity to investigate the facts and ascertain the truth.

"Such conduct, however futile in its results, clearly constitutes 'an obstruction to the administration of justice.'  *  *  *

"The question is not whether, as matter of fact, the court has been or will be deterred from the performance of its duty; but, as said by Mr. Chief Justice White: 'The test, therefore, is the character of the act done and its direct tendency to prevent and obstruct the discharge of judicial duty.  *  *  *'

" 'Again it is said there is no proof that the mind of the judge was influenced or his purpose to do his duty obstructed or restrained by the publications, and therefore there was no proof tending to show the wrong complained of. But here again not the influence upon the mind of the particular judge is the criterion, but the reasonable tendency of the acts done to influence or bring about the baleful result is the test. In other words, having regard to the powers conferred, to the protection of society, to the honest and fair administration of justice and to the evil to come from its obstruction, the wrong depends upon the tendency of the acts to accomplish this result without reference to the consideration of how far they may have been without influence in a particular case. The wrongdoer may not be heard to try the power of the judge to resist acts of obstruction and wrongdoing by him committed as a prelude to trials and punishment for his wrongful acts.' Toledo Newspaper Co. v. U. S., 247 U. S. 402."

[1] It may be well to repeat that ordinarily the court does not concern itself with attacks of a personal nature nor should it interfere with the fullest exercise of the right to criticize freely. Whether such criticism be just or unjust, the court cannot descend to controversy. It can only hope that, in the light of facts and actual happenings, its conduct may be understood in due time.

[2] A charge, however, either that the court has denied to public officials "any access to original sources of information" in respect of properties being administered by the court, or that it has adopted and practiced a policy of denying such access, is one of the gravest charges which can be made against a court. One of the great developments in the administration of justice in Anglo-Saxon jurisprudence was that justice should be administered in the open.

So firmly is it established in the administration of justice in American courts that records shall not be secret that a charge of this character can only have the effect of creating distrust in the minds of those who are not informed. There are few men who do not desire the good will and the confidence of the community in which they live, and this is a human desire entertained as much by judges as by others. They realize that, while errors of judgment are usually treated with tolerance, deliberate denial of the opportunity of ascertaining the facts in respect of matters affecting the public welfare will not and should not be tolerated.

When, therefore, such a charge is made, one of its subtle purposes is to subject a court to public condemnation, and thereby to intimidate the judge into adopting a course, contrary to what he may deem proper and just.

With this understanding of the nature of the case, it remains to examine the principal contentions advanced on behalf of the defendant.

[3] 1. *Publication.* It is urged that there was no publication of the

letter, as matter of fact and law. There was much testimony taken on this point. After the letter was dictated by defendant on the morning of October 6, 1919, the stenographer who transcribed the notes read the letter pursuant to defendant's direction to the committee on finance and budget of the board of estimate and apportionment (composed of all the members of the board), which was then holding a meeting in the comptroller's office. It was not marked "private" nor "personal," and was then sent by hand to the Public Service Commissioner, who was holding the conference above referred to. All such letters, according to defendant's testimony, are filed in the comptroller's office and open to public inspection.

From the practice in the department of finance defendant knew that such a letter would become public, and obviously would be published in the newspapers. The record establishes that there was a publication of the letters (1) by reading it to the committee on finance and budget of the board of estimate and apportionment; (2) by sending it to the Public Service Commissioner; (3) by the publications in the daily press.

[4] 2. *Denial of Access.* Prior to September 1, 1919, experts had been engaged by the receivers pursuant to the court's directions to report, among other things, on the financial position of the corporations and properties then being administered by the court through its receivers. The experts submitted their preliminary report or summary under date of September 4, 1919.

Upon the submission of such report, the court filed a memorandum dated September 6, 1919, calling attention to the report and the serious financial conditions therein set forth, and, among other things, instructing the receivers as follows:

"In order that the gravity of the situation may be generally made known, and that some appropriate action may be taken as speedily as is consistent with full information, the receivers are instructed to send a copy of the summary of Messrs. Stone & Webster and of this memorandum to the state and municipal authorities, and to civic and taxpayers' associations of the Greater City. At the same time the receivers will make it clear that every facility will be afforded both to public officials and citizens' associations to satisfy themselves in respect of the actual financial and other conditions existing in relation to the corporations now in their official charge."

On September 8, 1919, a copy of this memorandum and of the report of the experts was mailed to defendant. Defendant had read this memorandum of the court prior to October 6, 1919.

Defendant, however, never availed himself of the opportunity thus urgently extended to examine and investigate. The undisputed testimony shows that neither the defendant nor any official or representative of the municipal government ever applied directly or indirectly to Receiver Garrison, Receiver Hedges, or Trustee Sheffield to have access to any papers, documents, or information of any kind or description, whether they were "original sources of information" or otherwise, and that the policy of the court as carried out by its officers was to invite access to any information in their possession or under their control.

The testimony of the defendant himself was to the same effect, viz. that access had never been denied to him, and that he never had made

any application of any kind or description for access to "original sources of information" or any information whatever.

3. The statement that the court made orders which precluded any application being made by the authorities of the city of New York to any other court or judge for any right of examination into the affairs or conditions of the said public utility corporations was shown by the testimony to have no foundation in fact. No such orders were made.

4. The statement that the court made orders denying to the authorities of the city of New York the opportunity to ascertain the truth was shown by the testimony to have no foundation in fact. No such orders were made.

5. The statement that an order of the court stood "between the public and the truth" was shown by the testimony to have no foundation in fact. No such order was made.

[5] 6. *Intent.* Defendant, Craig, insists that he did not intend to commit any contemptuous act nor to charge any wrongful conduct against the court. In answer to questions from his counsel he testified as follows:

"Q. Now, in writing this letter, did you have any intention whatever of a contemptuous act towards Judge Mayer? A. Certainly not. * * *

"Q. Now I will put the question in this way: In writing this letter, did you have any intention to commit any contemptuous act towards the court? A. I did not.

"Q. Did you have any intention to charge any misconduct, ignominy, or wrongful conduct of any kind or character towards Judge Mayer, or towards the court? A. No."

It appears that defendant introduced a resolution in the board of estimate and apportionment in January, 1919, authorizing an application to the court that he, as comptroller of the city of New York, should be appointed a coreceiver of the so-called B. R. T. Rapid Transit Companies. The resolution was adopted. This application was made to the court on January 15, 1919, and was denied. See opinion of court, printed volume 1, Proceedings B. R. T. Receivership, p. 233 et seq.

Defendant testified as to his state of mind induced by the denial of the application to appoint him a coreceiver; but he did not attempt to give to the language of his letter other than its plain and unmistakable meaning.

His mental attitude was thus stated by him:

"It was my view on the 6th of October, as it had been in the preceding February, that it was only that kind of access (i. e., that which would flow from his appointment as coreceiver) to original sources and access with power under the control of the court to require any subordinate, however recalcitrant or unwilling he might be, to produce whatever there was in the way of information, so that with that in view, and desiring to get Nixon where, if he could accomplish something, he could put the municipal authorities on the same footing as the attorneys for the traction companies, I wrote this letter of October 6th to him, using language that I thought would get into the mind of Nixon the necessity for that kind of co-operation. * * *"

"The Court: If I understand correctly, it was not intended to convey the meaning that at any time the judge referred to have in point of fact denied access to any—particularly papers, documents or sources of information, except in connection with what you regarded as the results flowing from the refusal to appoint yourself in your representative capacity as receiver?

"The Witness: That is correct. * * *"

In addition to the foregoing testimony, numerous questions were asked and answered with regard to other parts of the letter and the testimony was in general to the same effect as quoted supra.

From the testimony it will be found that defendant himself testified:

(a) That the court never denied him access to any information.

(b) That the statement by defendant as to the "policy" of "denying access" was not intended to refer to any actual occurrences, but to the result which, from defendant's point of view, flowed from the refusal to appoint him coreceiver.

It is a fundamental principle that men are held responsible for the natural consequences of their acts. The unexpressed state of mind of defendant may explain what moved him to write as he did, but cannot change the plain meaning or the effect of what he wrote. The plain meaning of defendant's language was to charge the court with conduct incompatible with the due administration of justice, which charges were false, and the effect was "to obstruct the administration of justice." Toledo Newspaper Co. v. U. S., 247 U. S. 402, 38 Sup. Ct. 560, 62 L. Ed. 1186.

It is therefore found that, in respect of the matters set forth in the paragraphs numbered 1, 2, 3, and 4 of the information, the defendant is guilty of contempt of court under section 268 of the Judicial Code (Comp. St. § 1245).

The United States attorney is directed to submit to the court, on two days' notice to counsel for defendant, a proposed order in accordance herewith which shall also provide that the defendant shall appear before the court in courtroom 331 of the Old Post Office Building on February 24, 1921, at 2 p. m., at which time such further proceedings will be had as may be proper.

The defendant is not only the incumbent of a high office, but is also a member of the bar of this court. It is manifestly his duty to do all in his power to repair the wrong he has done. It is not a wrong with which the judge concerns himself in a personal sense, and for that reason no personal apology is desired nor required. The wrong has been perpetrated against the administration of justice.

The reparation which is within the power of the defendant is promptly to make and file in the office of the clerk of the court an unqualified retraction of the false statements respecting the court, referred to in paragraphs 1, 2, 3, and 4 of the information.

### Appendix A.

State of New York, Public Service Commission for the First District.

No. 49 Lafayette Street.
Telephone, Franklin 5800.
Lewis Nixon, Commissioner.
Edward J. Glennon, Deputy Commissioner.
Alfred M. Barrett, Deputy Commissioner.

Counsel: Terence Farley.
Secretary: James B. Walker.

New York, October 1, 1919.

Sir: As an outcome of to-day's hearing on the separation of lines from the New York Railways Company, I feel that it is my duty to invite you to attend a conference of all parties at interest in the transit situation.

·` `My position since taking office has been that in case any concessions were granted by the city that concessions in return should be made by the companies, such concessions to be of a nature that will induce the city government to grant relief.

We are face to face, not only with vast losses to the people of the city, but with lowering of the standard of service, physical deterioration of property and equipment and demoralization of organization.

Had the matter received constructive and businesslike handling four months ago, the present crisis could have been avoided and the great system of free transfers saved to the traveling public.

For temporary concessions extended to the companies great and lasting benefits could have been secured to the people of the city.

Efficient transportation is the life of our industrial and commercial enterprises. The disintegration already precipitated will lead to expense, inconvenience, and confusion for the traveling public and almost insurmountable difficulties in regulation. And even worse is to come.·

No one surely will assume the fearful responsibility of refusing to aid in mending this condition. The people of the city deserve better treatment, as burdens are being fastened upon them that it will take many years to lift and some time even to lighten.

I suggest a preliminary meeting at the offices of the Commission next Monday morning at 10:30 o'clock.

The traction companies I beg to take counsel and present such plans as they think will prevent further collapse and will in addition weld together the parted units, to the end that co-operation may be secured to at least as full an extent as existed before the receiverships began. They must be prepared to make drastic concessions for any favors received.

To the city, through the board of estimate and apportionment, a plea is made for a sincere participation in this conference (either in their individual official capacities, as a board, or through a representative with power) which should secure advantages to the people.

A general readjustment, fair to all, can only be secured by a round the table discussion leading up to negotiation. The city holds the whiphand in the matters as the companies seek concessions.

Each side believes in the integrity of its claims, but human nature is such that at it seems futile to expect the limit of concession to be stated by either unless satisfied of the earnest desire of the other to secure an agreement.

It may be necessary to review figures and examine leases and agreements that will consume time, but no further time should be lost in starting to secure a meeting of minds on this vital subject.

.Very respectfully,                    Lewis Nixon, Commissioner.

Appendix B.

Department of Finance, City of New York.

Charles L. Craig, Comptroller.                    October 6, 1919.

Hon. Lewis Nixon, Public Service Commissioner, No. 49 Lafayette Street, New York·City—Dear Sir: Replying to your letter of October 1st:

Apparently without inquiry and without information you have fixed the time for the proposed conference upon a date which, if observed, would require the members of the finance and budget committee of the board of estimate and apportionment (comprising the entire board) to drop the preparation of the largest budget in the history of New York City, in which work, as you could easily have ascertained, they have been for some time and must continue to be·engaged in daily sessions from early to late.

In your letter you say: "It may be necessary to review figures and examine leases and agreements that will consume time."

Before any such conference can be seriously considered, and as evidence of good faith on the part of those acting by and under the authority of United States District Judge Mayer, there must be a reversal of the policy for which Judge Mayer is responsible, of denying to myself and other members of the board of estimate and apportionment any access to original sources of information concerning the property and affairs of these various public utility corporations holding franchises to·operate in the streets of New York.

When the applications were made to Judge Mayer in the "friendly" proceedings instituted by those interested in these corporations for the appointment of a receiver of their own liking, if not of their own selection, the corporation counsel of the city of New York, acting under instructions from the board of estimate and apportionment given at my instance, urged upon Judge Mayer that he appoint an additional or coreceiver acceptable to the board of estimate and apportionment to see that the facts and conditions of the corporations involved were fairly and fully presented to the United States District Court in the course of the receivership so that any orders or decrees that might be made by the court would be fair and just to the city of New York, and the members of the board of estimate and apportionment might be accurately informed with respect thereto in order that any action deemed necessary by the city might be taken.

As you must be aware, it is a very common thing in large receiverships to appoint additional receivers, particularly where there are varied and conflicting interests, and I have never been able to understand why in a matter of great public concern such as this Judge Mayer set himself against it. It was clearly understood that conditions were certain to develop in these receiverships where the responsible authorities would be urged to take action which no honest or intelligent man could be expected to consider without the most exact and complete information upon the entire subject. Judge Mayer refused to grant any of the relief sought by the city. He not only denied the relief, but he made orders which preclude any application being made by the municipal authorities to any other court or judge for any right of examination into the affairs or conditions of these corporations seeking municipal aid and favor.

Truth is the mightiest weapon in every controversy. The orders of Judge Mayer deny to the municipal authorities the opportunity to ascertain the truth.

The franchise and rights enjoyed by these corporations were mostly all procured many years ago when corrupt political rings were in control of public affairs and the darkest scandals of municipal history, both in the old city of New York and in the city of Brooklyn prior to consolidation, are those in relation to such grants. The affairs of the franchise holding corporations have been in the hands of the boldest and most unscrupulous manipulators engaged in the exploitation of the rights obtained from corrupt political rings. Up to the present moment they have defied every power that has sought to open up the books and original records for search and examination in the public interest. They will open and open wide without any reservations or restrictions before there will be any conference so far as I am concerned.

It seems to me a monstrous thing that an order of a federal judge in a court of equity should stand between the public and the truth under such circumstances. Such an order is hostile to every interest of the city of New York in these controversies. Its operation and effect is to disarm the municipal authorities, to deny them the most effective instrument of redress, and to force them into a contest with corporate powers entrenched in darkness and concealment.

The responsibility for the turmoil, delay, and dissatisfaction that has followed upon the orders of Judge Mayer denying to the city of New York any representation in these receiverships rests upon those who procured and are protected by such orders.

As a first and preliminary evidence of good faith, those who desire such a conference and a reasonable solution of existing complications should procure the entry of orders by Judge Mayer putting the city of New York on an equal footing with the private interests active in the receiverships. A refusal to do this can but prolong and embitter the controversy, and it will not in the end procure any advantage whatever to the traction interests.

    Yours very truly,                   Charles L. Craig, Comptroller.