STATE EX REL. SCHMIDT, Relator, vs. GEHRZ, Circuit Judge, Respondent.

*June 12—July 8, 1922.*

*Prohibition: When writ will issue: Constitutional law: Free speech: Interference with course of justice: Restraint.*

1. A writ of prohibition is an extraordinary remedy and will not issue where there is an adequate remedy by appeal or otherwise.
2. Prohibition will not issue to restrain a circuit judge from proceeding in contempt against one violating an order restraining the publication of facts involved in pending actions, which came into the hands of the jurors and tended to frustrate justice, as a conviction in the contempt proceedings may be reviewed in the manner discussed in *State ex rel. Rodd v. Verage,* 177 Wis. 295.
3. The right of free speech is not an unqualified one, as the common welfare is not subordinate to any individual right, which ceases at the point where its exercise militates against the public good.
4. While a court should not hesitate to protect the administration of justice from improper influences, the right of free speech should be suppressed with great caution and only to the extent that is necessary to prevent an interference with the course of justice.

PETITION for a writ of prohibition to restrain the respondent, as circuit judge, from proceeding further in a contempt proceeding pending in the circuit court for Milwaukee county. *Writ denied.*

It appears that while jurors were being examined upon their *voir dire* in the case of Minnie Olson v. The Milwau-

kee Electric Railway & Light Company in the circuit court for Milwaukee county, presided over by the respondent, a certain circular was exhibited to them and they were asked concerning their acquaintance therewith. This circular was in the nature of an advertisement of a forthcoming book constituting a sensational arraignment of the business practices and policies of the Milwaukee Electric Railway & Light Company and contained references to three or four cases then pending in the circuit court for Milwaukee county against that company.

When the jury was impaneled the respondent, as presiding judge, sharply admonished them with reference to their duty and most explicitly cautioned them against talking with any person about the case. After the case had been on trial for two or three days the defendant's attorneys presented to the court affidavits indicating that some of the jurors had violated the caution and admonition of the court, and as a result the court withdrew one juror and declared a mistrial. There was reason to believe that this circular had been called to the attention of some of the members of the jury during the course of the trial, and, upon declaring the mistrial, the court initiated an investigation as to the source of the circular and the extent of its circulation in Milwaukee county.

Upon discovering that the relator was the author of the circular, he was summoned to appear before the court, at which time he was duly sworn and examined with reference to his connection therewith. Upon this examination it appeared that he purchased a contract which had been entered into between the Milwaukee Electric Railway & Light Company and a former employee, by the terms of which such employee released all claims and demands against the company upon consideration of the payment of $5,000 in cash. It was further agreed that $5,000 of certain bonds should be paid such employee five years later if he should not press any pretended claims against the com-

132    SUPREME COURT OF WISCONSIN.    [July

State ex rel. Schmidt v. Gehrz, 178 Wis. 130.

pany or use the same to annoy the company or any of its officers, and it was provided that certain officers of the company were to determine whether the conduct of such employee was such as to entitle him to the bonds at the end of the five-year period. It was a part of the agreement that said employee should deliver to the company all documents, reports, and other papers in his possession relating in any manner to his activities in connection with services alleged to have been rendered to said company, its officers, agents, or employees, or any of them, and that neither the same nor the copies thereof should be thereafter used by him or by any one in his behalf, or by his authority, without the consent in writing of the company. This contract is referred to in the circular as the "Hush-money contract." The following are a few of the statements contained in this circular:

"It became necessary to revise the first circular on account of additional sensational information and the changing of the name of the book."

"The important information that will be contained in the book entitled 'The Ten Thousand Dollar Hush Contract' will be discussed under the following titles and proofs given to sustain the whys and the wherefores with all other accusations herein made, with a photograph of the hush contract and the written instructions on the secret manipulations."

"The T. M. E. R. & L. Co. has agreed to pay the equivalent of 160,000 street-car fares, as hush money, to keep information from the innocent investor and the Milwaukee public. Why?"

"An employee of the T. M. E. R. & L. Co., under the direction of the claim department, in the guise of an insurance agent and under assumed names, investigated prospective jurors in the civil and circuit courts of Milwaukee county, and said employee later became the recipient of the ten thousand dollar contract. Why?"

"Place your order for the book entitled The Ten Thousand Dollar Hush Contract that is to be published for the benefit of the public without malice, and read the gripping,

authentic story and sordid personal experience of a former employee of the T. M. E. R. & L. Co. It may help to save your honest dollars in the future. Delivery of the book will be made as soon as it comes off the press."

"The man who signs bonds and securities for the electric company signed the hush contract, an agreement whereby a former employee of the T. M. E. R. & L. Co. received five thousand dollars down and five thousand dollars within a period of five years, if he would refrain from revealing information as to the acts and conduct of the officials and agents of the North American Company and the T. M. E. R. & L. Co. Why?"

The following extracts had direct reference to pending cases, some of them being substantially taken from complaints on file:

"James D. Mortimer, while president of the T. M. E. R. & L. Co. and a resident of Milwaukee, drafted a petition for lower gas rates for the residents of the city of St. Louis against the La Clede Gas Light Company of that city and gave written instructions in his own handwriting to a former employee of the T. M. E. R. & L. Co., the recipient of the hush contract under assumed names in relation to said petition and in this manner, keeping under cover in the city of St. Louis until said James D. Mortimer accomplished his purpose, and said Mortimer caused said petition to be filed, through the assistance of said employee, with the Public Service Commission of Missouri, and before a hearing could be had with the Public Service Commission of Missouri in relation to the petition, James D. Mortimer, and the man, who later became the recipient of the hush contract left for parts unknown. Why?"

"The body of a wife and mother, who died from injuries received in a street-car accident, was taken from her coffin after the mourners left the cemetery and placed on old boards and 'mutilated' at the instance of the claim department of the T. M. E. R. & L. Co., through the assistance of Peter Molgard, *alias* Mathison, *alias* ——, together with the employee who later on received the ten thousand dollar hush contract. How?"

"A member of the E. M. B. A., an employee of the T. M. E. R. & L. Co., under fear of prosecution, was obliged to

State ex rel. Schmidt v. Gehrz, 178 Wis. 130.

work for a period of two years at a nominal wage, paying part of his earnings to the T. M. E. R. & L. Co. He was placed on probation by a self-appointed probation officer for a period of two years, with the knowledge, consent, and approval of the T. M. E. R. & L. Co. Why?"

As a result of this disclosure the respondent, as presiding judge, in open court made the following order:

"Now, I will say to you, *Mr. Schmidt,* I will enjoin, restrain, and forbid you from mailing or distributing or passing out of your possession any more of these circulars, and I will enjoin, restrain, and forbid you from writing any further manuscript or having written by anybody any manuscript for the book that you have in contemplation, or from causing that book to be published, or bound, or issued, or circulated, or sent out or sold. This injunction will hold good until the further order of this court."

This order was made on March 7, 1922. On April 7, 1922, the respondent, as judge of said circuit court, made, and on April 8, 1922, caused to be served upon said relator, an order returnable on April 15, 1922, requiring him to show cause why he should not be punished as and for a contempt by reason of his disobedience of the order entered March 7th. On April 15, 1922, the relator appeared and pleaded not guilty to the contempt charge. The proceeding was then by his consent continued to April 22, 1922, when he appeared by his attorneys and moved for a vacation and setting aside of the injunctional order made on March 7th. The proceeding was further continued until May 19th. On May 9th this court, upon the petition of relator, issued an order requiring the respondent to show cause why he should not be restrained from further proceeding in said contempt proceeding. The cause was submitted upon the return of the respondent, which set forth, among others, the facts above enumerated.

For the relator there was a brief by *Gugel & Greenthal* of Milwaukee, and oral argument by *F. H. Gugel.*

*Frank T. Boesel* of Milwaukee, for the respondent.

OWEN, J.  It is well settled in this state that the writ of prohibition is an extraordinary remedy and will not be issued where there is an adequate remedy by appeal or otherwise.  *State ex rel. Meggett v. O'Neill,* 104 Wis. 227, 80 N. W. 447; *State ex rel. Tewalt v. Pollard,* 112 Wis. 232, 87 N. W. 1107; *State ex rel. Milwaukee E. R. & L. Co. v. Circuit Court,* 134 Wis. 301, 114 N. W. 455; *Petition of Pierce-Arrow M. C. Co.* 143 Wis. 282, 127 N. W. 998.  If the court had no jurisdiction to enter the injunctional order of March 7th against the relator, the proper method for securing a review thereof is by writ of *certiorari.*  If the court did have jurisdiction to enter the order, it is appealable under sec. 3069, Stats.  At the time of the entry of the order, therefore, the relator stood on an equal footing with any other person against whom a restraining order had been entered.  We discover no special facts or circumstances constituting anything in the nature of an exigency which should arouse the extraordinary jurisdiction of the court in the manner prayed for.  If the relator violated the injunction he is in no different position from that of any other contemnor under like circumstances.  If he be convicted in the contempt proceeding he may secure a review by this court in the manner open to all others who have been convicted and sentenced to punishment for contempt.  The proper procedure in such cases is quite fully reviewed in *State ex rel. Rodd v. Verage,* 177 Wis. 295, 187 N. W. 830, and need not here be rediscussed.

Whether, in our present view of the proper procedure to secure a review by this court of convictions in contempt proceedings, the case of *State ex rel. Att'y Gen. v. Circuit Court,* 97 Wis. 1, 72 N. W. 193, relied upon by relator, should be followed, need not here be discussed, as he has not been convicted of contempt.  His present complaint is that he has been unlawfully restrained from circulating the document in question, and that question can be

brought to this court for review in the manner already indicated.

While it follows from what has been said that the writ should be denied, it is proper and perhaps desirable that we should comment briefly upon the general aspects of the case. The petitioner maintains that the order of which he complains works a denial of his constitutional right of free speech. The right of free speech is not an unqualified one. Under our government the common welfare is not subordinate to any individual right. On the contrary, the right of the individual ceases at the point where its exercise militates against the public good. The administration of justice is a delicate and exacting function. Nothing contributes more to the stability of society than confidence on the part of the individual in an honest and incorrupt administration of justice. While the scales of justice should be most delicately poised and responsive to every legitimate influence, no suitor should be obliged to overcome the weight of illegitimate influence, such as bias, prejudice, or passion. An administration of justice that commands the confidence of the individual must zealously and rigorously guard the scales from the influence of every irrelevant consideration. The duty of the court in this respect can scarcely be exaggerated. Its power to do so has never been doubted.

For the purpose of our present consideration we assume that the petitioner has the right to publish his contemplated book at the proper time and under proper circumstances. But he does not have the right to publish anything that will interfere with the orderly and pure administration of justice. He cannot poison the mind of the community from which juries are recruited by a public discussion of the merits of a cause pending in court, between private parties, in which the public has no interest. To permit this is to allow a right, which society has secured to the individual, to be used to frustrate the ends and purposes

State ex rel. Schmidt v. Gehrz, 178 Wis. 130.

of government. Under such circumstances it becomes an abuse and not an exercise of the right of free speech.

The circular in question contained declarations which constituted the basis of three or four actions then pending for trial in the circuit courts for Milwaukee county. These declarations were made as statements of fact. It was the purpose to impress the reader with their truth. It appeared that some 25,000 of these circulars had been distributed in Milwaukee county. It appears that three cases involving facts set forth in that circular were called for trial subsequent to the issuance of the injunction and the filing of respondent's return herein. A copy of the examination of the jurors in each of those cases is appended to the return, from which it appears that a number of the jurors called in each case had seen and read the circular. If as a matter of fact the circulation of this paper tended to frustrate or interfere with the orderly administration of justice in Milwaukee county, it was within the power of the court to prevent its circulation during the pendency of such cases. *Toledo Newspaper Co. v. U. S.* 247 U. S. 402, 38 Sup. Ct. 560; *Bee Pub. Co. v. State* (Neb.) 185 N. W. 339. See, also, notes in 2 British Ruling Cases, 498, and 15 English Ruling Cases, 34. Whether the circulation of the circular in the manner disclosed constituted an interference with the administration of justice in the county of Milwaukee was a question which the judiciary of that county is specially qualified to determine.

We suggest, however, that while a court should not hesitate to protect the administration of justice from improper influences, the right of free speech is held dear by every American citizen, and it should be suppressed with great caution, and then only to the extent that seems absolutely necessary to prevent an interference with the course of justice. Likewise, as was said by the federal supreme court in *Gompers v. Bucks S. & R. Co.* 221 U. S. 418, 450, 31 Sup. Ct. 492, the power to punish for contempt "is spar-

ingly to be used." While courts are necessarily clothed with broad powers in order to enable them to properly discharge their functions, such powers should be exercised with wisdom and discrimination and only for the accomplishment of the purposes which call them into existence. They should not be used arbitrarily, capriciously, or oppressively. With these general remarks, we decline to interfere with the proceeding sought to be restrained, and the writ will be denied.

*By the Court.*—So ordered.